Date signed March 31, 2016



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   13-13847-TJC |
| Vincent L. Abell | * | Chapter   11 |
| Debtor | * | |
| *   *   *   *   *   *   *   * | * | |
| Roger Schlossberg, Chapter 11 Trustee | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  14-00417 |
| Vincent L. Abell, *et al.*, | * | |
| Defendants | * | |

## MEMORANDUM OF DECISION RESOLVING MOTIONS TO DISMISS

Roger Schlossberg, the Chapter 11 trustee, filed a 118-page amended complaint alleging that the debtor Vincent L. Abell, his wife Marta Bertola, and numerous related parties and entities, engaged in a massive real estate and asset concealment scheme to hide millions of dollars of assets from the debtor's creditors and the court.  The amended complaint, as filed, named 44 defendants and included 43 counts for relief against the debtor and various

defendants.[1]  Presently, before the court are motions to dismiss filed by the following groups of defendants:

(1) Caniss Construction, Inc., and Cristino Gonzalez (ECF 11);

(2) Marta Bertola, Phoenix Real Estate 2, LLC, Modern Management Company Employee Benefit Trust, Phoenix Real Estate 2 LLC Employee Benefit Trust, and Columbia Security, LLC (ECF 21);

(3) Vincent L. Abell, Phoenix Real Estate, LLC, Modern Management Company, 107 47th Street Builders, LLC, 1828 18th Street, LLC, 2103 Suitland Terrace, LLC, 277 Newcomb Street, LLC, 1311 T LLC, 2925 26th Street Builders, LLC, 3514 13th Street, LLC, 3750 Bel Pre Builders, LLC, 5118 Hanna, LLC, 6014 Prince George Street, LLC, 2926 Partnership, and Alabama Builders, LLC (ECF 24);

(4) Maria Antonopoulos, Fela Bertola, American Trust, LLC, V.L.A., a minor child, Bronte Abell, Alexandra Abell, and Christian Abell (ECF 25); and

(5) Maria Maya (ECF 29).

For the reasons set forth here, the court will deny the motions to dismiss as to Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 19, 20, 21, 26, 27, 28, 29, 30, 31, 35, 36, 37, 38, 39, 40, 41, 42, and 43 and grant the motions to dismiss as to Counts 32 and 33.  While the court is denying the motions to dismiss Count 36 to the extent it seeks disallowance of claims under 11 U.S.C. §502(b),[2] the court will stay Count 36 to the extent it seeks disallowance of claims under §502(d).

## I. Facts as Alleged in the Amended Complaint

The following pertinent facts are alleged in the amended complaint and are assumed to be true for purposes of the motions to dismiss.

---

[1] A number of defendants settled the claims against them. The settling defendants are James E. Abell ("Dr. Abell"), Mt. Zion Village Partnership, Parkview Towers, LLC, Asset Lending Corporation, American Security, LLC, Abell Family Partnership, Mt. Airy Apartments, LLC, and any unknown parties owned or controlled by Dr. Abell.  The court has included a limited number of factual allegations as to these settling defendants because they support the Trustee's theory about Mr. Abell's far ranging fraudulent scheme.

[2] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §101 et seq., as currently in effect.

*A. Background*

On March 5, 2013, Vincent L. Abell (hereinafter "Mr. Abell") filed for Chapter 11 bankruptcy relief.  Post-petition, Mr. Abell operated his real estate business and managed his personal affairs as a debtor-in-possession pursuant to §§1107 and 1108.  Upon motions filed by the United States Trustee and creditor Maria Wilson, and with the consent of Mr. Abell, the court ordered the appointment of a Chapter 11 trustee.  On September 19, 2013, the court approved the appointment of Roger Schlossberg as trustee (the "Trustee").

The events giving rise to the bankruptcy and this adversary proceeding can be traced back several years.  Prior to filing for Chapter 11 protection, Mr. Abell was engaged in the real estate business, specifically, buying, selling, and leasing residential properties.  Mr. Abell, along with his associates, engineered a mortgage rescue scam to dupe vulnerable and elderly individuals out of their homes.  He pretended to help those who fell behind on their mortgage payments.  Mr. Abell would convince his victims that he would pay off their outstanding mortgages in exchange for their promise to repay him.  However, the documents memorializing the proposed loans were predominantly illegitimate, and instead of signing promissory notes, Mr. Abell's victims unwittingly deeded their homes over to him.  Once Mr. Abell held his victims' deeds, he would further abuse their desperate financial position and create a landlord-tenant relationship.  The rental amounts were set high so that most individuals could not afford the monthly payments, and upon default, Mr. Abell would evict his victims and either re-lease or sell the homes for a profit.

Marta Bertola (hereinafter "Ms. Bertola") is Mr. Abell's estranged wife, and is the lead actor in his purported fraudulent plots.  ECF 7 at ¶126.  As Mr. Abell's former lawyer, notary

public, and licensed real estate agent, Ms. Bertola represented him in numerous transactions, and she witnessed and notarized numerous deeds and other legal documents that Mr. Abell used to fraudulently transfer properties to various entities or close associates.  *Id.* at ¶129.  She has assisted in preparing a variety of documents in connection to the transfers of property, including, "the creation and recordation of many of the false deeds, deeds of trust, and other sham instruments intended to deceive and perpetuate false and misleading information concerning the ownership of Abell's companies and properties."  *Id.* at ¶132.  She also prepared land instrument intake sheets in connection with the recording of deeds, in which she knowingly included false consideration amounts.  On numerous occasions she prepared lease documents involved in Mr. Abell's mortgage rescue scam.  She has also admitted to altering deeds and at least one HUD-1 after the documents were signed, including adding the amount of consideration and challenging the amount of reinstatement figures.  *Id.*

Many of Mr. Abell's victims pursued civil actions against him.  *Id.* at ¶6.  Several have been filed in Maryland, and as many as 130 cases have been filed in the District of Columbia. As pertinent to this adversary proceeding, Maria Wilson ("Ms. Wilson") filed a civil lawsuit against Mr. Abell on April 13, 2007, after he evicted her out of her home for failure to maintain rent payments.  The court awarded Ms. Wilson compensatory and punitive damages of $2 million as against Mr. Abell and his management company, Modern Management.

After Ms. Wilson obtained the judgment, she attempted to obtain post-judgment discovery in aid of enforcement.  Mr. Abell inimically thwarted her efforts by refusing to answer basic questions about his assets and entities and by refusing to provide information about the extent of his holdings.  Since the judgment, Mr. Abell has concealed from his creditors and the bankruptcy estate his assets and obstructed any efforts by his creditors to collect on their

judgment.  As a result of Mr. Abell's refusal to cooperate in discovery and turnover of assets and records, and given the complexity of Mr. Abell's fraud, the full scope of his assets and fraud is not yet known.

### B.  Scheme to Evade Creditors

To evade his judgment creditors and other victims who were pursuing him for his fraud, Mr. Abell concocted a two-fold scheme to avoid repaying his creditors: (1) orchestrating sham transactions to hide his assets and the nature of the true ownership; and (2) defrauding the bankruptcy court.

Mr. Abell engaged in various sham transactions with friends and family members to hide his assets to the detriment of his creditors and the bankruptcy estate while retaining his equity. He employed eight types of schemes: (a) creating sham transfers of property or corporate interests to friends and family members for no consideration and with little or no supporting documentation or recordation; (b) creating more than 100 limited liability companies, which in turn own hundreds of properties; (c) designating his friends and family members, on paper, as members of the LLCs or as property owners, when in fact Mr. Abell is the true beneficial owner of the interests and his friends and family are merely nominal owners; (d) opening multiple bank accounts, so called "escrow" accounts and purported "employee benefit trusts" to launder funds; (e) creating sham liens that are purportedly held by family and friends on properties as security for non-existent loans; (f) directing that income from the sale of assets be funneled away from himself and, instead, to others to hold in secret for him; (g) abusing the corporate and LLC form, and ignoring corporate formalities; and (h) attempting to use the "tenants by the entirety" form of titling assets as a way to cut off his creditors from his assets.  *Id.* at ¶75.  The amended complaint

identifies over 200 entities that Mr. Abell purportedly maintains a secret interest in, and the list of entities was appended in a spreadsheet attached and labeled as *Exhibit 1*.[3]

    1.  <u>Modern Management and Phoenix Real Estate (the "Phoenix Transfer")</u>

Mr. Abell, as the sole owner of Modern Management, used this company and its purported successors to acquire and control hundreds of rental properties and evade paying creditors. Shortly after Ms. Wilson obtained her judgment against both Mr. Abell and Modern Management, and in an effort to insulate himself and his assets, Mr. Abell ceased the operations of Modern Management. In its place, Mr. Abell created Phoenix Real Estate, LLC ("Phoenix 1"), which he purports to have held as tenants-by-the-entirety with Ms. Bertola. Phoenix 1 occupied the same office space, utilized the same assets, and maintained the same accounts, employees, and operations as Modern Management; it was just operating under a different name. Ultimately, Mr. Abell's judgment creditors learned that Phoenix 1 was a continuation of Modern Management, and then Mr. Abell shut down Phoenix 1 and created Phoenix Real Estate 2, LLC ("Phoenix 2"). Ms. Bertola was designated as the sole owner of the new management company. As with Phoenix 1, Phoenix 2 occupied the same office space, utilized the same assets, and maintained the same accounts, employees, and operations as Modern Management. Despite Mr. Abell's contention that he maintains no ownership interest in Phoenix 2, he caused it to pay his attorney fees' in the underlying bankruptcy case.

Ms. Bertola assisted Mr. Abell in perpetrating this scam, and she represented both Modern Management and the Phoenix entities in connection with the litigation filed against them. *Id.* at ¶¶127-128. She also prepared the lease documents used by these entities in the mortgage rescue scam. As the current sole owner of Phoenix 2, she receives tens of thousands of

---

[3] The amended complaint and subsequent motions to dismiss, objection, responses and replies refers to the list of Mr. Abell's purported entities as "Concealed Assets".

dollars in rent checks each month from the properties that comprise the Phoenix 2 portfolio.  The funds received, instead of being paid into the bankruptcy estate, have been disbursed to numerous other people and entities.  *Id.* at ¶131.

2.  Phony conveyances and transfers of property for no consideration

In an effort to conceal assets from his creditors Mr. Abell directed, and continues to direct, that substantial revenues and income generated from concealed assets be conveyed to others including Ms. Bertola, Phoenix 2, and another entity, American Trust, LLC ("American Trust").  The transfers also occurred within three years of Mr. Abell's bankruptcy petition.  Additionally, most of the purported transfers have occurred without consideration and were made strictly for the purpose of avoiding the claims of creditors, and they occurred after Ms. Wilson obtained her judgment against Mr. Abell in 2007.

Despite not having any equity interest in the properties or other assets, the many defendants named in the amended complaint have received rental payments from properties owned by Mr. Abell.  Such payments have been deposited into the bank accounts of Phoenix 2, and then distributed to other various defendants.  *Id.* at ¶¶161-162.  Rent payments from 1776 Lyman Place, NE, 1925 Valley Terrace, SE, and 636 14th Place, NE have been paid to defendants American Trust and Phoenix 2 even though those entities are not entitled to receive the rental income.  Rents received from other properties, owned by Mr. Abell, have also been deposited into bank accounts in the name of Phoenix and then disbursed to other defendants.

Ms. Bertola also played an integral role in this part of the scheme.  Many of the documents prepared by Ms. Bertola show a transfer of ownership to herself or to her and Mr. Abell as tenants by the entirety.  One such transfer occurred two weeks after Ms. Wilson obtained her judgment.  Mr. Abell transferred a piece of property located at 3549 Bruton Parish

Way in Silver Spring, Maryland, to Ms. Bertola for no consideration, and she went on to sell that property to a third party for $325,000. *Id.* at ¶133. This was not an isolated incident, because again, in November 2007, Mr. Abell transferred a property from himself to both he and his wife, jointly. That property was sold eventually for $610,000, and Ms. Wilson did not receive any of the proceeds. *Id.* at ¶134. In addition, Ms. Bertola purposefully failed to record deeds of trust in a timely manner to obscure Mr. Abell's interest in real property. In 2009, she prepared a no consideration deed purporting to transfer 610 Bennington Drive from Mr. Abell, individually, to Mr. Abell, as trustee for his daughter. Ms. Bertola contends that she prepared the deed in 2006, but the deed was not recorded until 2009. Even after the recordation, Mr. Abell continued to control the property and have rents paid to Phoenix.

    3.   <u>Phony loans and deeds of trust liens</u>

To obscure Mr. Abell's interest in properties, phony deeds of trust were created and filed. These deeds of trust indicated that Mr. Abell received more than $2,640,000 in loans from family members and business associates.[4] *Id.* at ¶136. However, no such loans actually existed. Instead, the deeds were concocted to ensure that proceeds from the sales of particular properties would flow directly to the holder of the deeds, and away from Mr. Abell's judgment creditors. One such deed was executed on June 30, 2009, in favor of Cristino Gonzalez ("Mr. Gonzalez") that collateralized a $75,000 loan. However, there is no indication that Mr. Gonzalez actually loaned Mr. Abell $75,000. To the contrary, Mr. Abell's Statement of Financial Affairs did not include a loan from Mr. Gonzalez. *Id.*

Ms. Bertola also created phony deeds of trust that listed her mother as the beneficiary. *Id.* at ¶139.

---

[4] Mr. Abell transferred approximately $1 million to defendant Chang Chon prior to filing bankruptcy, and Mr. Abell transferred hundreds of thousands of dollars to Chang Chon over a several year period prior to filing the petition.

4. <u>Fraudulent Enterprise through Limited Liability Companies</u>

Mr. Abell amassed a real estate portfolio in the name of his numerous companies and in the name of individually held properties.  His companies include Modern Management, Phoenix 1, Phoenix 2, and American Trust, and the entities that are listed in *Exhibit 1* of the amended complaint.  He maintains an interest in these companies or properties in one of four ways: (i) he acquired or holds them directly as an individual; (ii) he acquired or holds them through a limited liability company that he owns; (iii) he acquired or holds them along with his wife, Ms. Bertola, as tenants-by-the-entirety; or (iv) he acquired them or holds them through limited liability companies purportedly owned by people other than himself.  *Id.* at ¶79.  The hundreds of entities created and controlled by Mr. Abell are structured to benefit him, and regardless of whose name is on a deed to real property, associated with a trust or designated as the owner of a company, Mr. Abell maintains a beneficial secret interest and is acting as the puppet master.

Despite having an interest in numerous corporations and limited liability companies, Mr. Abell acknowledged at his meeting of creditors that he generally disregarded any notion of corporate formality.  *Id.* at ¶77.  Mr. Abell also did not have a personal bank account in the last five years before the bankruptcy and instead used money from his management company's "escrow account" to pay his expenses.  *Id.*

Mr. Abell employed Ms. Bertola, Fela Bertola ("Ms. Fela Bertola"), and Maria Maya ("Ms. Maya") to help perpetrate his fraud.  As part of the hustle and in addition to her other legal work with Mr. Abell's scheme, Ms. Bertola helped Mr. Abell form hundreds of limited liability companies, and she served as the resident agent for many of them.  *Id.* at ¶¶137-138.  The purpose of creating hundreds of companies was to make it impossible for a creditor or court to follow the proceeds from a real estate sale.  Ms. Bertola used her own mother, Ms. Fela Bertola,

in the sham to falsely assert that she made a loan to Mr. Abell and in return she received a phony

deed of trust.  Mr. Abell's current girlfriend, Ms. Maya, has assisted Mr. Abell in acquiring

properties for his own personal benefit through Sun Valley Builders, LLC, a company that Mr.

Abell and Ms. Maya maintain is owned solely by Ms. Maya, but Mr. Abell is secretly the true

owner of.  *Id.* at ¶144.

### a.  Modern Management Employee Benefit Trust

Mr. Abell and Ms. Bertola also used a Maryland corporation, Asset Lending Corporation,

to hide Mr. Abell's ownership of 321 18th Street.  Mr. Abell caused Asset Lending to transfer

321 18th Street to Modern Management Employee Benefit Trust ("MM-EBT") for no

consideration, and then Ms. Bertola recorded a loan of $809,000 in the name of Asset Lending in

order to encumber the property MM-EBT had been deeded by Mr. Abell.  *Id.* at ¶¶102-106.

### b.  American Trust

American Trust is a limited liability company that Mr. Abell used to hide assets and was

the predecessor to Asset Lending.  *Id.* at ¶111.  Mr. Abell established Asset Lending by reviving

a forfeited company, University Leasing, which was founded in 1961, but by 1986, had forfeited

its corporate status.  *Id.* at ¶90.  In March 1988, Mr. Abell was listed as the sole owner and

shareholder of University Leasing, which had become known as American Trust Company.  On

March 9, 1988, Mr. Abell filed Articles of Revival on behalf of University Leasing and formally

changed the name to American Trust, with himself as resident agent.  *Id.*  Mr. Abell eventually

changed the name of the company from American Trust to Asset Lending.

The documents establishing American Trust, dated July 14, 2004, list each of Mr. Abell's

children as 25% owner of American Trust and Mr. Abell as the permanent general member.

ECF 25-1.  Subsequently, on March 28, 2014, Mr. Abell officially resigned, effective November

18, 2013, from the position and Ms. Bertola became the new managing member.  ECF 25-2.

Despite what the documents state, Mr. Abell continues to be the true beneficial owner of

American Trust and operates it as an extension of his other businesses.  ECF 7 at ¶¶111-112.

Mr. Abell has utilized American Trust to sell properties which he owns and then to

borrow the proceeds from the sale.  Specifically, Mr. Abell purported to convey property located

at 6425 14th Street to American Trust, although no documentation exists from this transfer.  *Id.*

at ¶113.  The property was sold for approximately $3,000,000 in 2008, but none of the funds

remained with American Trust.  Instead, American Trust loaned Mr. Abell all of the proceeds

less $500,000, which was distributed to a title company.  *Id.*  Ms. Bertola stated that "Abell

probably removed the funds so that Wilson and her attorney couldn't get their hands on it."  *Id.*

at ¶114.  In addition to borrowing funds from American Trust, Mr. Abell used its funds to pay

his judgment bond in the *Wilson* case.  *Id.* at ¶115.

### c.   Caniss Construction and Mr. Gonzalez

Mr. Gonzalez is the purported owner of Caniss Construction ("Caniss"), which filed a

proof of claim in the bankruptcy case for $92,342.94 for construction, remodeling, and

renovation services rendered to Mr. Abell's properties.  In fact, Mr. Abell controls Caniss and is

the true owner.  He transferred at least $700,000 to Caniss in wire transfers since 2008 for work

ostensibly done on his properties.  In addition to the proof of claim filed by Caniss, Mr. Gonzalez

filed a proof of claim for an alleged personal loan that he made to Mr. Abell for $75,000.

### 5.   Post-petition fraud and deception

Mr. Abell has continued his fraudulent scheme even after filing for bankruptcy.  He has

put millions of dollars of assets and income from his real estate empire out of the bankruptcy

court's reach.  In his schedules, he either failed to schedule or misrepresented the nature of his

interest in the hundreds of properties and companies included in *Exhibit 1* of the amended complaint. These are the assets that Mr. Abell retains a secret beneficial interest, and they are not listed in his Statement of Financial Affairs or in the bankruptcy schedules.

Concealed assets, not yet included in the bankruptcy estate, include Mr. Abell's ownership interest in Phoenix 2, which generates substantial rental revenues that are being diverted away from the bankruptcy estate. Through Phoenix 2, Mr. Abell obscured his true ownership interest in property located at 636 14th Place, NE, Washington, D.C. While Mr. Abell represented in Schedule A that this property was transferred from himself to American Trust for the benefit of his children, the lease documents recognize Phoenix 2 as the landlord's agent. Mr. Abell even directed the tenant to make rent payments to American Trust and Phoenix 2. *Id.* at ¶151. Since Phoenix 2 is a mere continuation of Modern Management, any rent obtained from the new tenant should belong to the bankruptcy estate.

On March 20, 2014, the Trustee conducted a court approved auction sale of certain properties that were facially owned by Mr. Abell. Among the properties sold was 636 14th Place, NE, Washington, D.C. Despite the fact that American Trust owns the property, American Trust did not come forward to oppose the sale. Instead, Mr. Abell sent his father to bid on the property at the auction. *Id.* at ¶152.

To further insulate himself and his assets from creditors, Mr. Abell used funds from Asset Lending to purchase a $3 million judgment against himself and record the judgment in the name of Asset Lending in jurisdictions in which he holds property. *Id.* at ¶¶95-100. Mr. Abell then caused Asset Lending to file a phony proof of claim in his bankruptcy case based on the judgment to keep up the illusion. *Id.* at ¶100. When convenient for Mr. Abell, Asset Lending

has provided a partial release of the judgment so that Mr. Abell could sell properties "subject" to the purported judgment, free and clear.

Multiple defendants, including Ms. Bertola, American Trust, Columbia Security LLC ("Columbia Security"), Caniss, Mr. Gonzalez, Maria Antonopoulos ("Ms. Antonopoulos"), and Ms. Fela Bertola have filed sham or fraudulent proofs of claim against the estate, based upon the transactions entered into with Mr. Abell. *Id.* at ¶180. Phony proof of claims include the judgments against Mr. Abell in which he has obtained a full release, but which he had assigned over to him to trick creditors into believing that judgment liens exist on his real property. Notably, Ms. Bertola signed many of the proofs of claim as the authorized agent.

6.   Post-petition bankruptcy abuse

Mr. Abell listed in his amended schedules a Roth IRA and MM-EBT as exempt assets. Creditors filed objections to this exemption contending that MM-EBT and the Roth IRA were not established or operated in compliance with applicable law, and thus could not be claimed as exempt retirement funds. A scheduling order was entered setting dates for discovery and trial. Mr. Abell failed to produce requested records, and Ms. Wilson and the Trustee filed motions for sanctions under Fed. R. Civ. P. 37(d). At the hearing held on the motions for sanctions, Mr. Abell's counsel argued that Ms. Bertola held control of all the pertinent records and because Mr. Abell was incarcerated he could not gain access to them. On February 18, 2014, the court granted the motions for sanctions, which Mr. Abell appealed for abuse of discretion. In that order, the court provided that MM-EBT was not established in compliance with applicable state or federal law and that it could not be exempt. On July 3, 2014, the district court affirmed this court's decision. Mr. Abell noticed an appeal to the Fourth Circuit Court of Appeals, but Mr.

Abell had not obtained a stay pending appeal.  On March 2, 2015, the Fourth Circuit affirmed the district court.

## II. Jurisdiction

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C §§1334(b) and 157(b), and Local Rule 402 of the United States District Court for the District of Maryland.  This adversary proceeding raises statutorily core claims under 28 U.S.C. §§157(b)(2)(A), (B), (C), (E), (G), (H), (J), and (K).  To the extent the court lacks constitutional authority to hear any claims, *see Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), all parties have consented to the court entering a final order and judgment other than Mr. Abell, Caniss, Mr. Gonzalez, Phoenix Real Estate 2 LLC Employee Benefit Trust, Phoenix 1, Modern Management Company, 107 47th Street Builders, LLC, 1311 T LLC, 2925 26th Street Builders, Alabama Builders, and Ms. Maya.  *See Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015).

## III. Legal Standards

The defendants in this action advance multiple theories as to why claims should be dismissed, why certain paragraphs should be stricken, and why more definite statements are appropriate in this case.  The following legal standards apply:

*A.  Fed. R. Civ. P. 12(b)(6)*

The defendants seek to dismiss the amended complaint under Rule 12(b)(6), which applies in adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b).  "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th

Cir. 1999)).  When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1949, 1943, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.  See also Twombly,* 550 U.S. at 547, 127 S. Ct. at 1960 (plaintiffs must nudge their claims "across the line from conceivable to plausible.").  The Supreme Court has noted that the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 681, 129 S. Ct. at 1951.  When presented with a complaint, a court may look to "more likely explanations" to find that the allegations do not plausibly establish the claim.  *Id*. at 681, 129 S. Ct at 1950.

## B.  *Fed. R. Civ. P. 9(b)*

Rule 9(b), which applies to adversary proceedings pursuant to Fed. R. Bankr. P. 7009(b), seeks to provide a defendant with sufficient and fair notice of a plaintiff's fraud claim in order to enable that defendant to defend him or herself.  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

The Fourth Circuit has found that to satisfy the Rule 9(b) pleading requirements, the complaint must identify with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* §1297, at 590 (2d ed. 1990)).  "Mere allegations of fraud by hindsight will not satisfy the requirements of Rule 9(b)." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (internal quotation and citation omitted).  In essence, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts." *Harrison*, 176 F.3d at 784.

Despite the stringent standards of Rule 9(b), where the plaintiff is a bankruptcy trustee courts are inclined to relax, but not eliminate, the particularity requirement for pleading fraud. *See In re Collins*, 540 B.R. 54, 59 (Bankr. E.D.N.Y. 2015); *see also In re Barton-Cotton, Inc.*, 2012 WL 2803742, at *3 (Bankr. D. Md. July 10, 2012) ("Bankruptcy courts have consistently held that the heightened pleading requirements of Rule 9(b) should be relaxed in cases brought by a third party trustee because of the trustee's 'inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party.'") (quoting *Schwartz v. Kursman (In re Harry Levin, Inc. t/a Levin's Furniture)*, 175 B.R. 560, 568-68 (Bankr. E.D. Pa. 1994)).

*C. Fed. R. Civ. P. 12(f)*

The defendants also ask this court to strike certain paragraphs[5] from the amended complaint pursuant to Fed. R. Civ. P. 12(f), made applicable in adversary proceedings by Fed. R. Bankr. P. 7012(b).  Rule 12 states that the court may "strike from the pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Courts in the Fourth Circuit have stated that Rule 12(f) motions to strike are "generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic."  *Pierre v. Ozmint*, 2010 WL 679946, at *2 (D.S.C. Feb. 24, 2010) (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001)).

The court does not find any of the enumerated paragraphs to be so immaterial, impertinent, vituperative, or scandalous that as a matter of law they must be stricken.  Therefore the court denies the Rule 12(f) motions and will not address them further.

## IV. Discussion

The Trustee's central allegation in the amended complaint is that Mr. Abell fraudulently concealed assets that belong to the bankruptcy estate.  He alleges the assets were not truly conveyed and the documents that purport to show a conveyance are in fact shams.  The amended complaint details that Mr. Abell has a secret beneficial interest in assets, real estate, and limited liability companies which are titled in the name of the various defendants.  The Trustee stresses that the evidence will show that Mr. Abell is the true owner, and requests that the court deny the motions to dismiss to permit this matter to go forward.  Alternatively, the Trustee alleges the transfers should be avoided as fraudulent conveyances.

---

[5] The defendants seek to strike ¶¶1-10; 13-18; 78; 82-88; 89-109; 111-114; 127-128; 130; 133-136; and 163 in ECF 7.

*A. Declaratory Judgment – Counts 1, 4, 7, and 39*

Defendants Mr. Abell, Phoenix 1, Phoenix 2, Mr. Gonzalez, Ms. Bertola, American Trust, Columbia Security, Ms. Antonopoulos, and Ms. Fela Bertola move the court to dismiss the declaratory judgment claims against them in Counts 1, 4, 7, and 39. Counts 1, 4, and 7 seek a declaration that Phoenix 2, Phoenix 1, and American Trust, respectively, are property of the estate. They also request a declaration that these entities and their assets are subject to liquidation by the Trustee for the benefit of creditors. Count 39 requests that any liens, claims or interests claimed by American Trust, Columbia Security, Mr. Gonzalez, Ms. Antonopoulos, Ms. Fela Bertola, and Ms. Bertola against Sale Properties Proceeds[6] or Concealed Assets are invalid or unenforceable. The claim also seeks a declaration that the Trustee's rights over the Sale Properties Proceeds or Concealed Assets are superior to the named defendants.[7]

The Declaratory Judgment Act of 1934, 28 U.S.C. §2201, provides in pertinent part:

> (a) In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. §2201. Three elements must be met to state a claim for declaratory judgment:

> (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;
> (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and
> (3) the court does not abuse its discretion in its exercise of jurisdiction.

---

[6] Sale Properties Proceeds is defined in the amended complaint as properties the Trustee sold pursuant to the sale order entered at ECF 483 in Case no. 13-13847.

[7] The Trustee also lodged this claim against defendants Dr. Abell, Asset Lending, American Security, Mount Zion Village Partnership, Mt. Airy Apartments, LLC, Abell Family Partnership, and 219 Atlantic Street, LLC. Except for 219 Atlantic Street, LLC, which has not filed an answer or a motion to dismiss, the Trustee has settled his claim with the aforementioned defendants.

*Volvo Const. Equip. N. Am., Inc. v. CLM  Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004)

(citations and internal quotation marks omitted).  In a bankruptcy context, the court has authority

to issue declaratory judgments on matters concerning the administration of the estate.  *See*

*McDow v. We the People Forms Ctrs., Inc. (In re Douglas)*, 304 B.R. 223, 231 (Bankr. D. Md.

2003).

According to a leading treatise, the purpose of a declaratory judgment is to provide a

vehicle to adjudicate rights and obligations in cases involving actual controversies that may not

be ripe or where a party has not filed suit yet:

> It relieves potential defendants from the Damoclean threat of impending
> litigation which a harassing adversary might brandish, while initiating suit
> at his leisure-or never.  It permits actual controversies to be settled before
> they ripen into violations of law or a breach of contractual duty and it
> helps avoid a multiplicity of action by affording and adequate, expedient,
> and inexpensive means for declaring in one action the rights and
> obligations of litigants.

10B Charles Alan Wright, et al., *Fed. Prac. & Proc. Civ.* §2751 (3d ed. 1998 and Supp.  2014)

(footnotes and internal quotations omitted); *see Broadvox-CLEC, LLC v. AT&T Corp.*, 2014 WL

3013275, at *3 (D. Md. 2014).  Declaratory relief is appropriate when the court finds that "(i) it

will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) will

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding."  *Cont'l Cas. Co. v. Fuscardo,* 35 F.3d 963, 965 (4th Cir. 1994) (quotation and

citation omitted).

The case of *Walker v. Weese*, 286 B.R. 294 (D. Md. 2002) is instructive.  As pertinent

here, the chapter 11 trustee alleged that an attempted fraudulent transfer of the debtor's property

was ineffective and sought a declaration that the property was property of the estate.  The trustee

also sought the imposition of a constructive trust over the property.  The issue before the district

court was whether to withdraw the adversary proceeding from the bankruptcy court upon the defendants' jury trial request, or to allow the proceedings to proceed before the bankruptcy court because the underlying relief being sought was equitable in nature and did not require a jury trial. The defendants argued that the declaratory judgment claim required a finding that a fraudulent conveyance had occurred, which should be determined by a jury. The district court determined that the declaratory judgment claim was different from a fraudulent transfer claim, and the declaratory judgment claim did not require a finding that a fraudulent transfer had occurred. The court further concluded that both the declaratory judgment count and the constructive trust counts were claims that are properly tried before the court. Thus, the court recognized the applicability of a declaratory judgment claim to a trustee's contention that property remained property of the estate because it was not effectively transferred.

Defendants Mr. Abell, Phoenix 1, Phoenix 2, Mr. Gonzalez, Ms. Bertola, American Trust, Columbia Security, Ms. Antonopoulos, and Ms. Fela Bertola dispute that a declaratory judgment is an independent cause of action, and when considering the other non-supported forms of relief in the amended complaint, there could be nothing left for the court to declare in terms of the parties' rights. They cite to *Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977, 993 (D. Md. 2002), for support. In *Miller*, the plaintiffs alleged that the lender violated the Maryland Secondary Mortgage Loan Law and the Maryland Consumer Protection Act by charging excessive or unauthorized fees in connection with the plaintiff's home mortgage loan. The plaintiffs sought a declaration that the lender's violation rendered the loan void or voidable as an illegal contract. *Id.* The court stated that "[i]f a loan made in violation of the [statute] is not void or voidable under Maryland law, then the [plaintiffs'] complaint fails to state a claim upon which relief can be granted under the [Declaratory Judgment Act]." *Id.* The court determined that

20

while the lender violated the statute, that violation, in and of itself, did not render the loan contract void or voidable.  Thus, the plaintiffs' illegal contract claim and declaratory relief was dismissed.

The fundamental difference between *Miller* and the case before this court is in the "underlying cause of action."  In *Miller*, the issue was whether the contract was void or voidable under Maryland law because the lender violated the statutes governing the loan.  Here, the Trustee requests the court, in essence, to determine the ownership rights of the defendants in the assets at issue, which he contends are really owned by Mr. Abell.  If the defendants do not own the assets at issue, then according to the Trustee, those assets are owned by Mr. Abell and should be declared property of the estate.  Despite what the defendants contend, it is clear that the controversy – as required by the Declaratory Judgment Act and a necessary element of the claim as provided in *Volvo* – is the determination of ownership of the assets.  There was nothing presented in the defendants' motions to suggest that the court does not have the authority to determine the ownership interest of a purported asset of the estate, and the court is within its authority to make that determination.  *See Walker*, 286 B.R. at 298-99 ("The transfers to the Trust were either valid or void against the creditors.  A bankruptcy court, acting pursuant to its equity jurisdiction and applying the requisite expertise, is better suited to resolve this question.").

The defendants also argue that declaratory relief is barred by the statute of limitations and that the Trustee failed to plead any facts that could support the claim.  "Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief."  *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S. Ct. 582, 584, 90 L. Ed. 743 (1946) (cited by *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1983 188 L. Ed. 2d 979, (2014)).  Thus, the court

determines, at this time, that the declaratory relief claims are not barred by the statute of limitations.

The court concludes that Counts 1, 4, 7, and 39 contain sufficient factual allegations to support a plausible claim for declaratory relief that the challenged assets are property of the estate. The allegations against each defendant are antagonistic and controversial. The core theory of the amended complaint revolves around Mr. Abell transferring assets and disbursing money to entities and close associates so that his creditors cannot find it, while maintaining control over the assets and their economic benefit. He did so to keep his assets out of the reach of the victims of his mortgage rescue scam. He concealed his ownership interest in three different ways:

First, with the help of Ms. Bertola, he transferred all business operations from Modern Management to Phoenix 1 and then from Phoenix 1 to Phoenix 2. He created the perception that Modern Management closed its doors. Phoenix 1 was titled in his and Ms. Bertola's names as tenants-by-the-entirety. Then they renamed the business Phoenix 2, which is now purportedly owned solely by Ms. Bertola. The amended complaint alleges that Mr. Abell is still the true and sole owner, and that he controls the business. Rents from Mr. Abell's properties have been paid to Phoenix 2 instead of to him. The amended complaint alleges these transfers were a sham intended to divert the value of these entities away from Mr. Abell's creditors, and that notwithstanding who may be listed as the owner of these entities and assets, the true owner is Mr. Abell. The amended complaint thus seeks a declaratory judgment that these entities and assets are property of the bankruptcy estate.

Second, along with Ms. Bertola, Mr. Abell created American Trust purportedly to benefit their children. Mr. Abell was the managing member, but the children are listed as the only

members.  Mr. Abell operates this also as extension of his real estate scheme.  He has conveyed real property to American Trust, sold that real property, and used most of the sale proceeds for his own benefit.  Mr. Abell also used American Trust funds to pay his judgment bonds, and he has used other funds under the guise of paying for college tuition.  Mr. Abell also directs rents from his properties to be paid to American Trust.

Third, he used his close associates and family members to conceal his assets through phony loans and deed of trust.  This includes Ms. Bertola, Mr. Gonzalez, Ms. Antonopoulos, and Ms. Fela Bertola.  The amended complaint paints a picture of a broad scheme to conceal assets from creditors by the creation of phony deeds of trust to these close associates.  Mr. Abell's cash would flow to these defendants as re-payment for a phony loan and a release of a phony deed of trust.  These defendants also filed sham proof of claims for phony deeds of trusts.  As to Mr. Gonzalez, the purported loan was not even included in Mr. Abell's Statement of Financial Affairs, which was filed under oath.

In sum, the motions to dismiss the declaratory judgment claim in Counts 1, 4, 7, and 39 are denied as to defendants Mr. Abell, Phoenix 1, Phoenix 2, Mr. Gonzalez, Ms. Bertola, American Trust, Columbia Security, Ms. Antonopoulos, and Ms. Fela Bertola.

B.  *Constructive Trust – Counts 2, 5, and 8*

Defendants Phoenix 2 and American Trust move to dismiss the Trustee's claims for the imposition of a constructive trust in Counts 2 and 8.[8]  In Count 2, the Trustee alleges that Phoenix 2 is owned by Mr. Abell and the estate, and not by Ms. Bertola, whose claim of ownership derives from Mr. Abell's fraud.  In Count 8, the Trustee claims that Mr. Abell and the estate are the true owners of American Trust, and that any other person's claim of ownership

---

[8] Phoenix 1 did not move to dismiss the constructive trust claim in Count 5.

derives from Mr. Abell's fraud.  In each respective count, the Trustee argues that the estate's interests in Phoenix 2 or American Trust are superior to that of any person or defendant.

The objecting defendants contend that a constructive trust claim cannot be a stand-alone claim under Maryland or District of Columbia law.  They argue that in both jurisdictions a constructive trust can only be imposed as a remedy for fraud, constructive fraud, misrepresentation, or unjust enrichment.  The Trustee disputes this contention and contends that this district has recognized a constructive trust as a stand-alone remedy on several occasions.

A constructive trust is an equitable remedy, which is

> employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property.  The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it. . . .  The purpose of the remedy is to prevent the unjust enrichment of the holder of the property.

*Wimmer v. Wimmer*, 287 Md. 663, 668, 414 A.2d 1254, 1258 (1980) (citations omitted); *see also Washington Suburban Sanitary Comm'n v. Utilties, Inc. of Maryland*, 365 Md. 1, 39, 775 A.2d 1178, 1200 (Md. 2001) (the Court of Appeals clarified that a constructive trust is a remedy for a claim of unjust enrichment); *accord Heck v. Adamson,* 941 A.2d 1028, 1029 (D.C. 2008) (cited by *Zanders v. Reid*, 980 A.2d 1096 (D.C. 2009) (In *Heck,* the court stated that a person is equitably bound to convey property to another if he would be unjustly enriched by retaining it)).

> Although a constructive trust is "not a cause of action in and of itself," *Lyon v. Campbell*, 33 F. App'x 659, 663 (4th Cir.2002), "Maryland courts have analyzed a plaintiff's constructive trust claim without acknowledging any other cause of action raised by [a] plaintiff," *Korangy v. Mobil Oil Corp.*, 84 F.Supp.2d 660, 667–68 (D.Md.2000) (citing, inter alia, *Wimmer*, 287 Md. at 668; *Starleper v. Hamilton*, 106 Md.App. 632, 666 A.2d 867 (1995)).

*Potts v. Potts*, 2014 WL 4060031, *11 (D. Md. Aug. 13, 2014).

In *Korangy v. Mobil Oil Corp.,* the court stated that "on at least three occasions, Maryland courts have analyzed a plaintiff's constructive trust claim without acknowledging any other cause of action raised by the plaintiff . . . .  A court need only determine which party has 'a sufficiently higher equitable call' to the property."  84 F. Supp. 2d at 667 (quoting *Starleper v. Hamilton*, 106 Md. App. at 640, 666 A.2d at 871).  The plaintiffs in *Korangy* requested the imposition of a constructive trust claiming that the defendants acquired the interests under circumstances that would make it inequitable for them to retain it.  The *Korangy* court determined that at the summary judgment stage, it was unable to decide who had a "higher equitable call" to the interest, denied the motion for summary judgment, and allowed the constructive trust claim to proceed, independently.  *Id.* at 668.

The amended complaint is replete with allegations that could lead to the conclusion that the bankruptcy estate has a higher equitable right to interests of Phoenix 2 and American Trust. Moreover, because the remedy of constructive trust is an equitable claim, the court determines, at this time, that the statute of limitations does not bar this action.

Under District of Columbia law, "[a] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it."  *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C. 1980) (quoting 4A *Powell on Real Property* §594, at 48–3 and 48–4 (1979)).  The defendants contend that under *Ross v. Hacienda Co-op., Inc.*, 686 A.2d 186, 191 (D.C. 1996), the District of Columbia constructive trust claims must be dismissed because it is a remedy and not a stand-alone cause of action.  That contention is incorrect.  The court in *Ross*, held that the underlying trial court had to analyze whether the defendant was unjustly enriched and therefore a constructive trust could be imposed.  686 A.2d at 191.  The underlying complaint did not contain

a separate claim for unjust enrichment, *id.* at 189, and the District of Columbia Court of Appeals did not address that as a requirement for a constructive trust claim.

Thus, the court will permit the claims to go forward. There are numerous allegations in the amended complaint that support the claim that the defendants have been unjustly enriched and that a constructive trust should be imposed.

*C. Turnover – Counts 3, 6, 9, 41, and 42*

Defendants Phoenix 2, Phoenix 1, American Trust, Mr. Abell, Ms. Bertola, and MM-EBT move the court to dismiss the turnover claims against them in Counts 3, 6, 9, 41, and 42.

In Counts 3, 6, and 9, the Trustee seeks to require Ms. Bertola, Mr. Abell, and any other defendant that possesses or controls any property that is property of the estate, to turnover that property as it relates to Phoenix 2, Phoenix 1, and American Trust. The Trustee requests that Ms. Bertola and Mr. Abell turnover that property that constitutes property of the estate within the meaning of §541. In Counts 41 and 42, the Trustee seeks the turnover of Mr. Abell's interest in the MM-EBT account in an amount not less than $175,000.00, and an accounting of all assets contained in the MM-EBT, the location of the assets, any proceeds, product, offspring, rents, or profits of such assets, the current value of the aforesaid, and all income received and expenditures made from the MM-EBT between the date of its inception and the date of any judgment entered by the court.

Section 542(a) provides in pertinent part:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

§542(a).  To prove a claim under §542(a), the trustee has the burden to prove that "(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate."  *In re DBSI, Inc.*, 468 B.R. 663, 669 (Bankr. D. Del. 2011) (internal quotation and citation omitted).  "[C]ourts generally agree that the turnover provision 'is not intended as a remedy to determine disputed rights of parties [,] [but] . . . to obtain what is acknowledged to be property of the estate.'"  *In re Minh Vu Hoang*, 469 B.R. 606, 617 (D. Md. 2012) (quoting *In re Suncoast Towers South Assoc.*, Nos. 98-10537-BKC-AJC, 98-1451-BKC-AJA-A, 1999 WL 549678, at *10 (Bankr. S.D. Fla. June 17, 1999)).  Therefore, to survive a motion to dismiss the Trustee needs to plausibly allege the three elements.

As to Counts 3, 6, and 9, the Trustee contends that the subject assets belong to Mr. Abell, and therefore, they are assets of the bankruptcy estate.  In response, the defendants argue that the subject assets do not belong to Mr. Abell and are not property of the bankruptcy estate.  Specifically, the defendants assert that Phoenix 2 is owned by Ms. Bertola solely, that American Trust is owned by the Abell children solely, and the only Remaining Concealed Asset titled in a name other than Mr. Abell's is Phoenix 2, which is titled in Ms. Bertola's name solely.  Ms. Bertola contends that due to the dispute of ownership of these assets dismissal is appropriate.  The defendants' contentions have raised genuine disputes as to the ownership rights in the assets at issue.  Because they have raised disputes as to the ownership rights of the assets, the defendants argue that the turnover claims under §542 should be dismissed because that section does not contemplate the turnover of disputed property.

The defendants are correct in their contention that turnover actions under §542 are limited to recovery of assets that are property of the bankruptcy estate.  *In re Minh Vu Hoang*,

469 B.R. at 617 (collecting cases).  However, that proposition is not applicable in this case because the Trustee is not bringing the turnover claims as standalone claims, but instead as ancillary claims to the declaratory judgment claims.  *See Olsen v. Reuter (In re Reuter)*, 499 B.R. 655, 669 (Bankr. W.D. Mo. 2013); *see also In re Maxim Truck Co.*, *Inc.*, 415 B.R. 346, 357 n.4 (Bankr. S.D. Ind. 2009) ("the Trustee's remedy under § 542 for turnover . . . only ripens upon a determination by the Court that the property in dispute is, in fact, property of the estate.").

As to Counts 41 and 42, Mr. Abell and Ms. Bertola move to dismiss all claims that relate to the MM-EBT account that is listed in Mr. Abell's Schedule C for failure to state a claim upon which relief may be granted.  In Mr. Abell's underlying bankruptcy case, there is no question that the court ruled that the MM-EBT account is a non-exempt asset of the estate.  ECF 386 in Case no. 13-13847.  As such, the Trustee has a duty to collect this asset for the benefit of creditors, and file any action necessary to compel the defendants to comply with the bankruptcy code including turnover and accounting under §542.

In the motions to dismiss, Ms. Bertola and Mr. Abell contend that Mr. Abell's interest is only for one-half of the fund, and that there is nothing in the court's order to suggest that Ms. Bertola is required to turn over her interest in the asset to the Trustee.  This contention is inappropriate at this stage because it raises issues of fact.  Accordingly, the court will permit the Trustee to seek turnover or accounting of the MM-EBT funds.

Further, defendants' response to Count 43 establishes the Trustee's need to maintain the turnover counts at this time.  In Count 43, as discussed *infra*, the Trustee alleges Mr. Abell and Ms. Bertola violated the automatic stay by failing to deliver to him assets that the bankruptcy court determined are not exempt, and therefore are property of the estate.  They argue they have no obligation to turnover the property – notwithstanding the court's order – because no turnover

order has been entered.  Defendants' position that they do not have to account for or turnover property unless a turnover order has been entered solidifies the Trustee's need to maintain the turnover counts at this time.

In sum, the motions to dismiss the turnover claims are denied as to defendants Phoenix 2, Phoenix 1, American Trust, Mr. Abell, and Ms. Bertola in Counts 3, 6, and 9 because they are ancillary claims to the request for declaratory judgment and can be determined after the court resolves the declaratory judgment claims, and the motions to dismiss Counts 41 and 42 are denied.

### D.  All Remaining Concealed Assets – Counts 19, 20, and 21

The amended complaint lodges three claims against the Remaining Concealed Assets that are not addressed in Counts 1 through 18.  As mentioned earlier, the Remaining Concealed Assets consists of the more than 200 allegedly concealed entities that are included on *Exhibit 1* of the amended complaint and that are not explicitly named as defendants.  In Counts 19, 20, and 21, the Trustee alleges that the Remaining Concealed Assets are assets of Mr. Abell, and that he is the true owner of the entities and therefore they are property of the estate.  The Trustee seeks a determination as to Mr. Abell's and the defendants' interests in the Remaining Concealed Assets.  Specifically, the Trustee requests declaratory judgment relief (Count 19), the imposition of a constructive trust (Count 20), and turnover of property (Count 21) as to the Remaining Concealed Assets under the same theories as asserted in Counts 1, 2, and 3.

In the motions to dismiss, the defendants adopt the same positions they took as to Counts 1, 2, and 3.  *See* ECF 25 at p. 35 of 48; ECF 21-1 at pp. 18-19 of 40.  Because the court has determined that Counts 1, 2, and 3 will survive the motion to dismiss, Counts 19, 20, and 21 will survive for the same reasons.

Certain entities are included on *Exhibit 1* that the parties refer to in this litigation as the "Tenancy by the Entireties Entities."[9]  The Tenancy by the Entireties Entities contend that Counts 19, 20, and 21 must be dismissed as to them because this court has already determined that they are properly owned by Mr. Abell and Ms. Bertola as tenants-by-the-entirety.  ECF 82.

The order these entities rely on was entered in response to Ms. Wilson's objection to Mr. Abell's claim of exemption of his interest in the Tenancy by the Entireties Entities, among other entities.  In the court's memorandum and order resolving the objection, entered on March 26, 2014, the court stated that:

> [a]t the original hearing on the Objection, the court overruled the Objection without prejudice to the filing of an adversary proceeding with respect to the voidability of any interest held by Ms. Bertola. That adversary proceeding . . . is in process with a pre-trial conference scheduled for April 24, 2014.  The subject motion (as reflected in the title) deals solely with the tenancy by the entirety issue and has no impact upon the issues dealt with in the adversary proceeding.

ECF 472 at pp. 1 and 2 of 5 in Case no. 13-13847.  The court included a footnote stating "[i]f the Plaintiff prevails in the adversary proceeding, the tenancy by the entireties would be destroyed and the outcome of this contested matter becomes meaningless."  *Id.* at p. 2 n.2.

The adversary proceeding to which the court's order refers is adversary proceeding 13-00537, filed by Ms. Wilson against Mr. Abell, Ms. Bertola, and others.  Counts 5 and 7 of the complaint named the Tenancy by the Entireties Entities as defendants and sought the imposition of a constructive trust and a declaration that certain conveyances made to Ms. Bertola by Mr. Abell were and are void.  Ms. Wilson brought the adversary proceeding before the Trustee was appointed in this case.  Once the Trustee was appointed, he filed the subject adversary

---

[9] The "Tenancy by the Entireties Entities" are 2926 Partnership, 1828 18th Street LLC, 2103 Suitland Terrance, LLC, 277 Newcomb St. L.L.C., 3514 13th Street, LLC, 3750 Bel Pre Road Builders, LLC, 5118 Hanna, LLC, and 6014 Prince George Street, LLC.

proceeding, Ms. Wilson's adversary proceeding was dismissed to allow the Trustee's action to proceed, and Ms. Wilson was allowed to intervene in this adversary proceeding. Thus, the current adversary proceeding succeeds to Ms. Wilson's adversary proceeding, and the Trustee is permitted to go forward with his claims against the Tenancy by the Entireties Entities, as contemplated by the order. For the sake of clarity, however, the court notes that should the Trustee not succeed on his declaratory judgment, constructive trust or fraudulent transfer claims against the Tenancy by the Entireties Entities, Mr. Abell's claim to an exemption of his interests in those entities has been resolved.

Accordingly, the motions to dismiss Counts 19, 20, and 21 are denied.

*E.  Section 548, Equitable Tolling and Collapsing Transaction – Counts 26, 28, and 30*

The Trustee also seeks recovery of Mr. Abell's assets under fraudulent conveyance theories. In the amended complaint, the Trustee alleges that Mr. Abell used "strawmen" and sham transactions to conceal assets and to avoid his judgment debts. *See* ECF 7 at ¶¶2, 10, 11, 12, 13, 14, 16, 20, 22, 27, 29, 30, 31, 32, 33, and 75. In Count 26, the Trustee alleges that in the event that Phoenix 1 or Phoenix 2 are determined to be separate and distinct entities and not a continuation of Modern Management, then he also alleges that the assets conveyed to create Phoenix 1 and Phoenix 2 are fraudulent conveyances. In Count 28, the Trustee claims that Mr. Abell, individually, or through American Trust, fraudulently conveyed funds to his children. In Count 30, the Trustee alleges that Mr. Abell conveyed $700,000 to Caniss[10] in wire transfers

---

[10] Count 30 also included claims against Adelbowale Adeleke, Fusion Contractors, and AG and Son. The Trustee dismissed all claims against Mr. Adeleke, without prejudice. *See* ECF 240. The court had entered default judgment against Fusion Contractors, which was set aside upon motion. *See* ECF 248. Thus, it remains pending. And AG and Son has not filed a motion to dismiss.

starting in 2008, and these transfers were made to hinder, delay, or defraud Mr. Abell's creditors.[11]

All of these defendants contend the Trustee's claims are time-barred. Ms. Bertola also argues that the transfers from Modern Management to Phoenix 1, and the transfers from Phoenix 1 to Phoenix 2, were not transfers of property of Mr. Abell. Therefore she contends the transfers are not subject to avoidance under §548. The court will begin with this latter argument.

Section 548 applies to transfers of "an interest of the debtor in property . . . ." §548(a). This phrase has generally been held to be "the equivalent of 'property of the estate.'" 5 *Collier on Bankruptcy* ¶548.03[2] (16th ed. 2016). Property of the estate is broadly defined, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983), and is interpreted to include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *In re Scotchel,* 491 B.R. 739, 743 (Bankr. N.D. W. Va. 2013) (quoting *In re Yonikus,* 996 F.2d 866, 869 (7th Cir. 1993)). Further, the language of §548:

> extends the avoidance power beyond a formal transfer of title or property ownership. Transfer of possession, custody or control fall within the definition of an interest of the debtor in property, and may be particularly applicable in the fraudulent transfer context in the case of transfers made with actual fraudulent intent. The debtor cannot evade the applicability of section 548 by hiding assets or placing them in someone else's possession while remaining the owner the property, in an effort to delay or hinder a creditor's ability to collect on the owed debt.

5 *Collier on Bankruptcy* ¶548.03[2], fn. 14 (16th ed. 2016).

The Trustee asserts that, despite the alleged transfers from Modern Management to Phoenix 1, and from Phoenix 1 to Phoenix 2, Mr. Abell remains the true owner of Phoenix 2 and its assets. He alleges the transfer was a sham intended to prevent Ms. Wilson and other creditors

---

[11] The Trustee makes a similar argument under §544 and state law, which is addressed in the following section.

from reaching the assets, but that Mr. Abell remained in control of the assets and realized their value.  The Trustee asserts Ms. Bertola acknowledged under oath that she did not know if she was a member in Phoenix 1, thus supporting the allegation that she had no legitimate ownership interest in Phoenix 1.  *See* ECF 7 at ¶83.  These allegations are sufficient to defeat the defendants' contention that the Trustee has not properly alleged a transfer of an interest of property of Mr. Abell.[12]

The court now turns to the second issue raised by the defendants: whether the Trustee's fraudulent transfer claims are time barred.  Section 548(a)(1) provides, in pertinent part:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition….

§548(a)(1).  Defendants contend that the Trustee is barred from pursuing transfers made before March 5, 2011, two years before the petition date, because they fall outside the two-year lookback window of §548.  The Trustee offers two theories to circumvent the lookback window of §548: equitable tolling and the collapsing transaction doctrine.

With respect to equitable tolling, the Trustee contends that the two-year lookback period in §548(a)(1) is a statute of limitations that can be equitably tolled.  Defendants argue that the two-year lookback period is a substantive element of the avoidance claim itself that cannot be equitably tolled.

Many courts have confronted this issue and rejected the idea that §548(a)(1) is a statute of limitations subject to equitable tolling.  *See In re Pitt Penn Holding Co., Inc.*, 2012 WL

---

[12] Moreover, the argument that the Trustee is not seeking to avoid a transfer of an interest of Mr. Abell's property came up late in the motion papers, in defendant's reply brief.  ECF 79 at 9.  Although it was discussed at the hearing, it was not fully developed by the parties. The parties may have an opportunity in future proceedings to revisit the issue of whether Mr. Abell transferred an interest in "property" when he transferred 100% of the assets from his company to a company owned by his spouse.  *See In re Collins*, 540 B.R. 54 (the court determined that the trustee may seek to avoid a pre-petition fraudulent transfer of assets from the debtor's closely held company to a new company controlled solely by the debtor's spouse).

204095, *2 (Bankr. D. Del. 2012) (declined to find that §548(a)(1) is a statute of limitations and instead determined that the two-year bar is a substantive element); *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133 (Bankr. D. Haw. 2011) (determined that two-year bar is a fixed period and that the text did not permit discretionary extension); *In re Laurie*, 2008 WL 886121, *5 n. 3 (Bankr. D. Md. 2008) (noted that the lookback period was not a statute of limitations but that it was a substantive element); *In re Lyon*, 360 B.R. 749 (Bankr. E.D.N.C. 2007) (held that the one year lookback was a substantive element and not a statute of limitations); *Crews v. Carwile (In re Davis)*, 138 B.R. 106 (Bankr. M.D. Fla. 1992) (held that the one-year time lookback period – now two years – is a restriction on the powers granted to the trustee and not a statute of limitations).

These courts, and others, have analyzed the language of §548 and concluded that the two-year period is a substantive element of the trustee's claim, not a statute of limitations.  *See In re Maui Industrial Loan*, 454 B.R. at 136.  As stated by the *Pitt Penn Holding* court, statutes of limitations "are rules of procedure . . . . they regulate secondary conduct, i.e. the filing of a suit, not primary conduct, i.e., the actions that give rise to the suit."  2012 WL 204095, *3 (quotations omitted) (citing *Steven v. Cent. Bucks Sch. Dist.*, 618 F.3d 411, 414 (3d Cir. 2010).  Section 548 does not cap when a trustee may bring a claim; it looks back to see if transfers occurred during the pertinent period.  *Id.*  Thus, the lookback period is part of the "actual substance" of the action.  *Id.*

Although the Fourth Circuit has not addressed this issue directly, the determination that the look back period in §548 is not a statute of limitations is consistent with the rationale of *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 255-56 (4th Cir. 2007).  There, the court considered whether the time limitations in §727(a)(8) for a debtor to obtain a second Chapter 7

discharge could be equitably tolled.  The court defined a statute of limitations as one that "requires a litigant to file a claim within a specified period of time."  *Id.* at 254.  It further stated that:

> all statutory periods to which courts have applied equitable tolling principles, contain these same two characteristics. First, they provide a plaintiff (in the bankruptcy context, a creditor) with a specified period of time within which the plaintiff must act to pursue a claim in order to preserve a remedy. Second, such periods commence when the plaintiff has (or discovers that he has) a 'complete and present cause of action.'

*Id.* at 255-56 (quotations and citations omitted).  When these two characteristics are present, "a court will often toll a period if it concludes that equitable considerations excuse a plaintiff's failure to take the required action within the time permitted."  *Id.* at 256.  The court concluded that §727(a)(8) did not contain either of these characteristics, and therefore equitable tolling did not apply.

        In *Tidewater*, the court distinguished the statutory scheme that was analyzed in *Young v. United States*, 535 U.S. 43, 47, 122 S. Ct. 1036, 152 L. Ed. 2d 79 (2002), which the Trustee relies upon as support for his argument on equitable tolling.  In *Young*, the question before the Supreme Court was whether the three-year lookback period in §507(a)(8)(A)(i) could be equitably tolled when the Internal Revenue Service had been stayed by an earlier bankruptcy from collecting the tax.  As the Fourth Circuit noted, the Supreme Court held that the three-year period in *Young* was a "limitations period *because* it *prescribe[d] a period* within which certain rights (namely, priority and nondischargeability in bankruptcy) may be enforced" by the claimant–there the IRS."  *Tidewater*, 498 F.3d at 255 (quoting *Young*, 535 U.S. at 47 (emphasis added)).  The Fourth Circuit also noted that the Supreme Court recognized that the "three-year period in *Young* 'commence[d] when the claimant [the IRS] ha[d] a complete and present cause

of action,' i.e., when the taxpayer's return was due." *Id*. (quoting *Young*, 535 U.S. at 49, 122 S. Ct. 1036).

Accordingly, the three-year period in *Young* passed the two-part test identified by *Tidewater* as statutory predicates for equitable tolling principles to apply. *Id.* Here, the text of §548 does not provide a specified time period to pursue a claim. Rather, the time limitation by which a trustee must commence an avoidance action is provided in §546.

Further support for the conclusion that equitable tolling principles do not apply is found in §548(d). That section provides that a trustee has the power to avoid a transfer, if:

> a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

§548(d)(1). Section 548(d) guards against secret or undisclosed transactions and therefore provides its own form of 'tolling' for such transfers. Under the law of most states, "a transfer is not made . . . until it becomes known or discoverable by exercise of reasonable diligence." 5 *Collier on Bankruptcy* ¶548.03[3] (16th ed. 2016).

> The purpose of postponing the commencement of the limitation period until the perfection of the transfer is to protect the estate against secret transfers that might be invulnerable to attack by the trustee if allowed to relate back to the date of original execution. It also serves the policy behind section 548 of protecting and conserving the debtor's estate for creditors by making the moment of importance the actual time at which the estate is diminished from the creditors' viewpoint.

*Id.*; *see also In re Brown*, 104 B.R. 609, 612 (Bankr. S.D.N.Y. 1989) (stating that Congress's intent was to permit the trustee to avoid secret transfers); *Butler v. Lomas and Nettleton Co.*, 862 F.2d 1015, 1019 (3d Cir. 1988) (finding that a transfer occurred on the date of a sheriff's sale and

stating that its finding comports with the purpose of §548(d), to prevent secret transfers from becoming immune to attack).  Thus, under the Bankruptcy Code, a transfer that occurred outside of the two-year lookback period could still be recoverable by the trustee if it meets the requirements of §548(d), without resort to equitable tolling principles.  On the other hand, "if the transfer is 'made' as defined in section 548(d)(1), prior to the numerical date which corresponds to and precedes by precisely two years the date of the filing of the petition, the transfer is invulnerable under section 548(a) . . . ."  5 *Collier on Bankruptcy* ¶548.09[1][b] (16th ed. 2016).

The court finds the foregoing authorities to be persuasive and concludes that the two-year lookback period of §548 cannot be equitably tolled.  The Trustee's claims in each count must be analyzed accordingly.

In Count 26, the Trustee seeks to avoid the transfer of all of the assets of Modern Management to Phoenix 1 and then from Phoenix 1 to Phoenix 2.  If these transfers are viewed separately, the first transfer that the Trustee wants to avoid – between Modern Management and Phoenix 1 – occurred before October 3, 2008.  *See* ECF 21-1 at 21 of 40.  This transfer occurred before the lookback period.  The second transfer that the Trustee seeks to avoid is the transfer between Phoenix 1 and Phoenix 2.  It occurred during the two-year lookback period.

Ms. Bertola argues that the transfer of all of the assets from Phoenix 1 to Phoenix 2 cannot be avoided.  She states that Phoenix 1 was held as tenants-by-the-entireties, and Maryland law exempts property held as tenants-by-the-entireties from claims of a creditor of only one spouse.  She argues that since Mr. Abell's individual creditors could not seek recovery against his interest in Phoenix 1, then the Trustee cannot seek to avoid the transfer for the benefit of creditors.  The Trustee alleges that Mr. Abell was the true owner of Phoenix 1, notwithstanding the purported labels attached to the ownership interests.  He also alleges that Phoenix 1 was not

held as tenants-by-the-entireties by Mr. Abell and Ms. Bertola. *See* ECF 7 at ¶¶13, 27, 75h, 83, 219, and 332; ECF 21-1 at 20-22 of 40. As stated above, he asserts Ms. Bertola acknowledged under oath that she did not know if she was a member in Phoenix 1, thus supporting the allegation that she had no legitimate ownership interest in Phoenix 1. At this stage in the litigation, the court cannot resolve this factual dispute, and must accept the facts alleged in the amended complaint as true and in the light most favorable to the Trustee. *See Iqbal*, 556 U.S. at 678.

In Count 28, the Abell children also move to dismiss the §548 claims against them for several of the same reasons discussed above. The amended complaint states that "[u]pon information and belief, Abell has conveyed at least $150,000 to Alexandra in the past three years, at least $46,000 to Christian in the past year, and at least $200,000 to Bronte in the past four years." ECF 7 at ¶352. The complaint was filed on July 7, 2014, and the bankruptcy case was filed in March 5, 2013. Thus, these allegations are sufficient to state a claim under either §548 or §549, *see* discussion below regarding Count 35.

As to Count 30, the Trustee argues that Caniss received money from Mr. Abell in wire transfers and for work purportedly performed on Mr. Abell's properties since 2008. The amended complaint alleges that Mr. Abell is the true owner of Caniss, and that Mr. Abell has concealed his ownership interest in Caniss from the onset to hinder the creditors' ability to discover these fraudulent transfers. *See* ECF 7 at ¶¶60, 366. The claim that Mr. Abell is the true owner of Caniss stands, but in the event this allegation is unproven, any transfer that occurred prior to the lookback period cannot be avoided under §548(a)(1).

The Trustee's second theory of recovery under §548(a)(1) applies only to the transfers from Modern Management to Phoenix 1 and from Phoenix 1 to Phoenix 2. He contends that the

transfers made outside of the two-year lookback period of §548 can be avoided under the collapsing transaction doctrine. The doctrine treats a series of transactions, under certain circumstances, as a single transaction for the purpose of deciding whether a fraudulent conveyance occurred. *In re Sunbeam,* 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (citing to *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir. 1995)). Specifically, "[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." *Id.*

As the court in *Sunbeam* noted, although the doctrine applies most frequently to financed leverage buyouts of companies, it has been applied in other contexts as well. *Id.* (citing *In re Best Prods. Co., Inc.,* 157 B.R. 222, 229–30 (Bankr. S.D.N.Y.1993) (citing leverage buyout cases, then collapsing sublease between subsidiary and parent corporation which was used as mere financing vehicle and treating loan as having been made directly to parent corporation)); *see also, Orr v. Kinderhill Corp.,* 991 F.2d 31, 35–36 (2d Cir. 1993) (collapsing transactions concerning corporation's (i) transfer of real property, and (ii) subsequent distribution of stock in transferee corporation, and treating integrated transaction as not supported by fair consideration); *see also, Voest–Alpine Trading Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 212–13 (3d Cir. 1990) (collapsing a series of transactions as a "sham" where transactions were designed to deprive a companies unsecured creditors of access to its assets by rendering company insolvent through foreclosure and transferring its assets to another company without fair consideration).

The Trustee also cites to *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 268-269 (Bankr. S.D.N.Y. 2013), for the proposition that the collapsing transaction doctrine

may bring an initial transaction that occurred outside the lookback period within the reach of a

fraudulent transfer claim if it is part of a single transaction:

> the law is clear that for statute of limitations purposes fraudulent conveyances are examined for their substance, not their form. As the Second Circuit has held: "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir.1993) (internal quotations omitted). In *In re HBE Leasing Corp.,* 48 F.3d 623, 638 (2d Cir.1995) (" *HBE Leasing I* "), the Circuit Court further held that the District Court had "correctly disregarded the form of this transaction and looked instead to [the] substance." It explained: "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction under the UFCA." As the Court continued, quoting *In re Best Products,* 168 B.R. 35, 56–57 (Bankr.S.D.N.Y.1994): " 'In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme.' " *HBE Leasing I,* 48 F.3d at 635–36; citation omitted); *In re Sunbeam Corp.,* 284 B.R. 355, 370 (Bankr.S.D.N.Y.2002) ("Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties in the transaction"). Most recently, in its summary order affirming the lower court in *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),* 447 B.R. 170, 186 (Bankr.S.D.N.Y.2011), *aff'd,* 480 B.R. 480 (S.D.N.Y.2012), *aff'd,* 541 Fed. Appx. 55, 2013 WL 5614238 (2d Cir. Oct. 15, 2013) (summary order), the Second Circuit concluded that the collapsing doctrine may be applied, *inter alia,* based on the transferee's "actual ... knowledge of the entire scheme."

*Id.* at 268-269 (footnotes omitted).

Similarly, the court in *In re James River Coal Co.,* 360 B.R. 139, 163 (Bankr. E.D. Va.

2007) considered whether the collapsing transaction doctrine could circumvent the one-year look

back period of §548.[13]  The court recognized that "[i]f the numerous steps taken to transfer the

debtor's property can reasonably be collapsed into a single, integrated plan that either defrauds

---

[13]  The look back period of §548(b) was amended in 2005 by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P.L. 109-8, April 8, 2005, H.R. Rep. 109-31(l).

creditors or leaves the debtor with less than equivalent value, the transaction may be avoidable." *Id.* It determined that at the motion to dismiss stage the trustee had pled sufficient facts to represent that the transaction at issue was a single unified transaction, and that any issues regarding the structure and nature of the transaction did not need to be resolved at that time.

Although the Fourth Circuit has not addressed the collapsing transaction doctrine, this district adopted the following test, which requires a court to consider whether:

1. All of the parties involved had knowledge of the multiple transactions;
2. Each transaction would not have occurred on its own; and
3. Each transaction was dependent or conditioned on other transactions.

*Sher v. SAF Financial, Inc.*, 2010 WL 4034272, *7 (D. Md. Oct. 14, 2010) (quoting *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 546-47 (Bankr. D. Del. 2005) ("all knew about the multiple steps of the transaction. Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent.")).

Here, the Trustee provides sufficient allegations in the amended complaint to meet the test as outlined in *Sher.* The Trustee alleges that, before any transactions occurred, Mr. Abell was the 100% owner of Modern Management, and it held numerous assets and had substantial value. After the last of the transactions occurred, his wife, Ms. Bertola, owned 100% of Phoenix 2, and it held all of the assets and value of Modern Management. The Trustee alleges that Mr. Abell and Ms. Bertola knew about the transfers of Modern Management to Phoenix 1 and then to Phoenix 2. *See* ECF 7 at ¶¶13-14, 83, 154, and 384-87. He also contends that the transactions would not have happened on their own, and that each transaction was dependent on the other because each step helped to insulate Mr. Abell and transfer all assets to Ms. Bertola. *Id.* at ¶¶2, 13-15, 82-88, and 332-346. Defendants make a number of factual arguments that challenge the

Trustee's allegations and argue that, under the facts as they assert them, the Trustee's allegations are not plausible. The court will not consider these factual assertions on a motion to dismiss. Thus, defendants' motion to dismiss Count 28, as it applies to the Phoenix transfers, will be denied.

F.  *Section 544 – Counts 27, 29, 31, and 38*

The Trustee also seeks avoidance of allegedly fraudulent transfers under §544 and pursuant to state fraudulent conveyance laws in Maryland and the District of Columbia.  The facts, allegations, and defendants in these counts are the same as those raised in Count 26, 28, and 30, except that the relief being sought here is under §544, rather than §548.  Section 544(b)(1) provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

§544(b)(1).  *See also*, 5 *Collier on Bankruptcy* ¶544.06 (16th ed. rev. 2014); *accord Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 243 (3d Cir. 2000).  In this case, the "applicable law" is found in the Maryland Uniform Fraudulent Conveyance Act ("MUFCA"), as codified at Md. Code, §15-201 *et seq.* of the Commercial Law Article, and specifically Md. Code. Ann., Com. Law §15-204 and §15-207. It is also found at D.C. Code §28-3104(a).

Some defendants argue that the Trustee has not sufficiently pled facts that establish his standing to assert a claim under §544(b).  To bring a claim under §544(b),  a trustee must show that there is: "(1) an unsecured creditor, (2) who holds an allowable unsecured claim under section 502, and (3) who could avoid the transfers at issue under applicable [state] law."  *MC*

*Asset Recovery, LLC v. S. Co.*, 2006 WL 5112612, at *3 (N.D. Ga. Dec. 11, 2006) (citations

omitted); *see Allou Distrib., Inc. v. Sound Around, Inc.*, 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2014)

("Section 544(b)(1) requires a trustee to show *both* that there is an actual creditor as to whom the

transfer is 'voidable under applicable law,' *and* that the creditor 'hold[s] an unsecured claim that

is allowable under section 502 of this title.'") (emphasis in original); *Young v. Paramount*

*Commc'ns, Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995) ("[T]he

trustee must show that at least one of the present unsecured creditors of the estate holds an

allowable claim, against whom the transfer or obligation was invalid under applicable state or

federal law."); *Ries v. Wintz Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 859 (B.A.P. 8th Cir.

1999) ("[I]n order to avail himself of the benefits conferred by § 544(b) . . . the Trustee 'must

first show that there is an actual unsecured creditor holding an allowable unsecured claim . . .

who, under [state] law, could avoid the transfers in question.'") (citation omitted)).

  The Trustee alleges that Mr. Abell undertook the scheme to make himself judgment proof

against the many victims of his extensive mortgage fraud.  The amended complaint alleges that

there are numerous creditors holding unsecured claims.  *See e.g*., ECF 7 at ¶25.  The court can

take judicial notice that the following creditors filed unsecured claims that date back to the

period before or at the time Mr. Abell is alleged to have made fraudulent transfers:

> o  Hedwig Cissel, Mark Cissel, and Karen Cissel filed proof of claim no. 4-1 in the
>
>  amount of $824,538.16, asserting an unsecured claim that arose from a judgment
>
>  they obtained against Mr. Abell dated May 26, 2009;
>
> o  Maria Taylor and Andria Taylor filed proof of claim no. 3-1 in the amount of
>
>  $137,218.29, asserting an unsecured claim that arose from a judgment they

obtained against Mr. Abell dated March 30, 2009, on a claim that, according to the proof of claim, dates back to 2007;

o Amy Parsons and David Parsons filed proof of claim no. 5-1 in the amount of $130,273.97, asserting an unsecured claim that arose from a judgment they obtained against Mr. Abell dated February 24, 2010;

o The Internal Revenue Service filed proof of claim no. 2-3, as amended, asserting a general unsecured claim against Mr. Abell in the amount of $45,165.77 plus interest of $18,599.63 which, according to the proof of claim, dates back to 2002 and 2006.

The Trustee also points to the claim of Ms. Wilson. She filed proof of claim no. 10-1 on May 10, 2013, in the amount of $3,004,018, arising from judgments against Mr. Abell obtained in 2007 and 2012. She listed the claim as a secured claim. Mr. Abell, however, listed the claim as unsecured on his schedules. Whether Ms. Wilson's claim is secured or unsecured can be developed as necessary going forward. The court concludes that the Trustee has standing to bring claims under §544(b) at this stage of the proceeding.

Defendants also argue that the transfers fall outside the statute of limitations for the Maryland and District of Columbia claims. The Trustee may bring an action under MUFCA within three years of the transfer. *See* Md. Code Ann., Cts. & Jud. Proc. §5-101 ("A civil action at law shall be filed within three years from the date it accrues . . . ."). Similarly, under District of Columbia law, "[a] cause of action with respect to a fraudulent transfer or obligation" is barred by the statute of limitations unless the cause of action is filed "within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or

obligation was, or could reasonably have been discovered by the claimant." D.C. Code §28-3109(l).

The Trustee offers several arguments in support of his contention that he is not time-barred from bringing these claims. First, he points out that it is well-settled that the discovery rule applies in Maryland, which permits tolling a statute of limitations when a plaintiff does not know or cannot discover the wrong. *See Hecht v. Resolution Trust Co.*, 333 Md. 324, 334, 635 A.2d 394, 399 (1994) ("a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong."). And under District of Columbia law, the discovery rule is incorporated into the statute itself, and a cause of action for a fraudulent transfer is barred after "1 year after the transfer or obligation was, or could reasonably have been discovered by the claimant." D.C. Code §28-3109(l).

The Trustee asserts throughout the amended complaint that Mr. Abell's concealment of the transfers prevented his creditors from discovering them:

> Abell fraudulently concealed from his creditors (and by extension, the Trustee) the actions that he, Bertola, and the other Defendants have taken, and continue to take, to hide assets from his creditors and divert assets away from the Estate. Abell's fraudulent conduct has prevented, and continues to prevent, his creditors and the Trustee from discovering, through the exercise of reasonable diligence, the claims that the creditors and the Trustee have against Abell and the other Defendants. Because of Abell's fraud, which the other Defendants have aided and abetted, the statute of limitations is tolled until such time as the creditors and Trustee actually discover a particular cause of action.

ECF 7 at ¶147.  These and other allegations throughout the amended complaint are sufficient to state a plausible claim that the statute of limitations was tolled on the fraudulent transfer claims under the law of Maryland and the District of Columbia.[14]

The Trustee also argues that, even apart from the discovery rule, a trustee "'under §544(b) may use statutes of limitations available to any creditor in whose shoes he stands in bringing the action,' including statutes under which a creditor would have the right to extend the otherwise applicable period of limitations."  ECF 52 at p. 36 (*quoting Osherow v. Porras*, 312 B.R. 81, 97 (Bankr. W.D. 2004)).  He states that on June 3, 2008, the Superior Court issued an injunction precluding Ms. Wilson from executing upon her judgment, and that the injunction remained in place until the Superior Court lifted it on November 22, 2011.  He argues, therefore, that the limitations period was tolled during the injunction period.

The Superior Court order reads, in pertinent part:

> ORDERED, that, provided the $300,000 Certificate is placed in the Registry of the Court within three (3) business days of the date of this Order, then, solely as to Defendant Vincent L. Abell, the plaintiff shall promptly rescind and withdraw any Notices of Judgment or other lien-creating filings in Virginia, Maryland and the District of Columbia and shall not take further actions to enforce any judgment against Defendant Vincent L. Abell until further Order of the D.C. Court of Appeals, or if remanded, this Court.

Defendants argue that the order did not bar Ms. Wilson from initiating a fraudulent conveyance action against Mr. Abell, but only from exercising specific enforcement remedies.  Defendants read the order too narrowly.  A bar from enforcing a judgment may well be a bar on bringing a fraudulent transfer claim.  For purposes of the pending motions, the Trustee's

---

[14] In its motion to dismiss, Caniss raises the affirmative defense that it provided fair consideration for the payments it received.  However, a motion to dismiss generally cannot reach the merits of an affirmative defense.  *Goodman v. Praxair, Inc.*, 494 F.3d 458 (4th Cir. 2007).

contention that the order barred Ms. Wilson from bringing a fraudulent transfer claim is plausible.

For the foregoing reasons, the motions to dismiss Counts 27, 29, 31, and 38 will be denied.

### G. Civil Conspiracy – Count 32

In Count 32, the Trustee alleges that Mr. Abell and Ms. Bertola[15] conspired to engage in unlawful, tortious, and fraudulent schemes and enterprises for the purposes of thwarting Mr. Abell's creditors and preserving Mr. Abell's wealth, and seeks $20,000,000 or such other amount to be proved at trial, plus pre-judgment and post-judgment interest and costs. Ms. Bertola asserts the Trustee has not stated a claim for civil conspiracy to commit a fraudulent transfer. The court agrees.

Initially, it is unclear whether Maryland or District of Columbia law applies to this Count.[16] The elements of civil conspiracy, however, are well established in both districts, and not disputed by the parties.

Under Maryland law the elements of civil conspiracy are "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 565 (D. Md. 2009).[17]

---

[15] Dr. Abell was originally named in Count 32, but the Trustee has since reached a settlement with him and the claims against him have been dismissed.

[16] The Trustee argues that he has alleged facts sufficient to sustain a claim of civil conspiracy under both Maryland and District of Columbia law.

[17] In Maryland, it is now established that liability for civil conspiracy requires "proof, that the defendant, although not committing the underlying tort, was legally capable of committing the underlying tort." *Shenker v. Laureate Education, Inc*., 411 Md. 317, 983 A.2d 408, 429 (2009). The Fourth Circuit recently reasserted this principle in *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014). In *Marshall*, the Fourth Circuit affirmed the

Under District of Columbia law the elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (internal quotation and citation omitted).

The parties also do not dispute that under both District of Columbia law and Maryland law, to plead a valid claim for civil conspiracy it is not enough to simply allege the elements. Instead, liability for civil conspiracy requires the performance of some underlying tortious act. "[Civil] conspiracy is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 446 (D.C. 2013) (internal quotation and citation omitted); *see also Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (finding that "[i]ndeed, the Maryland Court of Appeals has consistently maintained that conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.").

Defendants argue that the Trustee has no authority to bring a claim for conspiracy for fraudulent transfer. The Trustee disagrees, and also argues his claim is for conspiracy to commit fraud, and not merely conspiracy to fraudulently transfer assets. He argues that both Maryland and the District of Columbia recognize claims for civil conspiracy in fraud cases. In support of this position the Trustee cites to multiple Maryland and District of Columbia cases that recognize

---

dismissal of a claim against defendant for conspiring to violate Md. Code Ann., Com. Law §12-804(e), which prohibits a mortgage broker from charging a fee in a transaction in which the mortgage broker acts as the lender. The court concluded that a non-broker cannot be liable for conspiring with a mortgage broker to violate §12-804(e). The provision "imposes a duty only on mortgage brokers, and therefore only mortgage brokers are capable of violating it." *Id.* at 542. Thus, the defendant was not legally capable of committing the underlying tort and could not be liable on a conspiracy claim. In the absence of the §544 limitation addressed below, it appears that Ms. Bertola, who is alleged to be the transferee of fraudulent transfers, is legally capable of committing the underlying tort.

a civil conspiracy claim in fraud cases.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*,

636 F. Supp. 2d 1, 7 n.7 (D.D.C. 2009) (holding that the plaintiff adequately alleged civil

conspiracy because the underlying fraud claim that forms the basis for civil conspiracy was

adequately alleged); *Petry,* 597 F. Supp. 2d at 565 (finding that plaintiff sufficiently plead a

claim for civil conspiracy by alleging a detailed scheme under which defendants violated the

Maryland Finder's Fee Act); and *Fisher v. McCrary Crescent City, LLC*, 186 Md. App. 86, 144,

972 A.2d 954, 988 (2009) (stating that to establish liability under a theory of conspiracy "it is not

necessary to show that he was a party to its contrivance at its inception.  If it is shown that he

knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the

consequences.").

     Both formulations of the Trustee's claim fail.  Section 323 of the Bankruptcy Code states

that "(a) [t]he trustee in a case under this title is the representative of the estate[,] [and] (b) [t]he

trustee in a case under this title has capacity to sue and be sued."  §323.  The trustee's power to

sue and be sued, however, is not without limits.  Courts recognize two categories of lawsuits that

a trustee may bring: (1) those brought by the trustee as successor to the debtor's interest in the

estate under §541, and (2) those brought under one or more of the trustee's avoiding powers.  *See*

*In re Gaudette*, 241 B.R. 491, 497 (Bankr. D.N.H. 1999) (internal citation omitted).

     Turning first to the Trustee's claim that Ms. Bertola conspired with Mr. Abell to conceal

Mr. Abell's assets, this claim is not brought under the Trustee's avoidance powers.  Thus, the

Trustee must establish that he can bring this claim as successor to Mr. Abell's interest in the

estate.  However, the Trustee stands in the shoes of Mr. Abell and can only assert those claims

possessed by him.  The Trustee names Mr. Abell as a co-conspirator; indeed he is identified as

the primary actor in the conspiracy based on his pre-petition conduct.  The Trustee is barred from

bringing this claim because Mr. Abell "as an alleged co-conspirator, would not be able to maintain a cause of action for civil conspiracy and name either himself or a co-conspirator as a defendant." *See In re Gaudette*, 241 B.R. at 500; *see also In re Sia*, 349 B.R. 640, 655 (Bankr. D. Haw. 2006) (recognizing this principle but distinguishing between pre-petition and post-petition conspiracy claims); *see also In re Signature Apparel Group LLC*, 2015 WL 1009452, * 8 (Bankr. S.D.N.Y. Mar. 4, 2015); *see also Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, 459 B.R. 636 (Bankr. S.D. Tex. 2011).

The court also agrees with defendants that the Trustee cannot bring a claim that Ms. Bertola conspired with Mr. Abell to commit a fraudulent transfer. To the extent the Trustee brings this claim as successor to the debtor's interest in the estate under §541 based on pre-petition conduct, it suffers from the same defect as the claim to conspire to conceal assets, discussed above. To the extent the Trustee brings this claim under the estate's avoidance powers, he seeks a remedy greater than that provided in the Bankruptcy Code. Specifically, the Trustee seeks to recover damages from Ms. Bertola of $20,000,000. However, the remedy available to the Trustee under §544(b) and §550 is the avoidance and recovery of the property or the value of such property. To provide an additional remedy under these sections would conflict with both the case law and the Bankruptcy Code.

Numerous courts have held that the bankruptcy court cannot invoke state law remedies to circumvent or undermine the remedy legislated by Congress for the avoidance of a fraudulent transfer. *See In re Brentwood Lexford Parnters*, *LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003); *see also Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair Inc.*, 419 B.R. 749, 760 (M.D. Tenn. 2009); *and In re Lexington Oil and Gas Ltd., Co.*, 423 B.R. 353, 376 (Bankr. E.D. Okla. 2010). The court in *In re Brentwood*, rejected the trustee's claim for damages arising from

an alleged civil conspiracy to violate the Texas Uniform Fraudulent Transfer Act.  In rejecting

the claim, the court reasoned that the trustee's remedy for an avoided transfer was provided for

in §550, and that provision only allows a trustee to recover up to the amount of the transfer.  In

so holding, the court concluded that to allow any other recovery "could lead to a result that

expands remedies beyond § 550" and that "the court cannot invoke state law remedies to

circumvent or undermine the specific remedy legislated by Congress for the avoidance of a

fraudulent transfer."  *Id.* at 275.

Accordingly, Count 32 is dismissed.[18]

*H.  Post-Petition Transactions, §549 – Count 35*

In Count 35, the Trustee seeks to avoid under §549 all post-petition transfers identified in

the amended complaint.  He also seeks to avoid any post-petition transfers he discovers during

discovery or otherwise.  Section 549(a) provides:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee
> may avoid a transfer of property of the estate--
> (1) that occurs after the commencement of the case; and
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> (B) that is not authorized under this title or by the court.

§549(a).  The Trustee has identified post-petition transfers in the amended complaint.  He

identifies the alleged recipients of the transfers and alleges the transfers were not authorized by

the Bankruptcy Code or the court.  For example, the Trustee alleges that Mr. Abell has

transferred funds to his children over the past four years, dates that straddle the petition date.  To

---

[18] In Count 33 the Trustee alleges that Ms. Bertola and Ms. Maya provided substantial assistance, encouragement, and aid to Mr. Abell in the perpetration of his fraudulent scheme.  The primary difference between conspiracy and aiding and abetting is that "a conspiracy involves an agreement to participate in a wrongful activity" and "aiding and abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct."  *Halberstam*, 705 F.2d at 478. This distinction is not significant to the question of whether the Trustee can bring the aiding and abetting claim. Therefore, the court will dismiss Count 33 for the same reasons that Count 32 is dismissed.

the extent that these transactions occurred post-petition the Trustee has stated a claim. As to the remaining defendants, the amended complaint does not clearly state which transactions occurred post-petition. Accordingly, Count 35 is dismissed without prejudice as to any defendants who are not alleged to have received a post-petition transfer.

I. *Disallowance or Equitable Subordination of Claims – Count 36*

The Trustee seeks an order disallowing the claims of Ms. Bertola, Ms. Fela Bertola, American Trust, Mr. Gonzalez, and Ms. Antonopolous. In the alternative, the Trustee seeks to equitably subordinate the claims under §510(c). The court will address each in turn.

*Disallowance*

In Count 36, the Trustee requests that this court disallow proofs of claim Nos. 50 and 51 (filed by Ms. Antonopolous),[19] No. 53 (filed by Ms. Bertola),[20] No. 55 (filed by American Trust),[21] No. 58 (filed by Mr. Gonzalez),[22] and No. 60 (filed by Ms. Fela Bertola).[23] The

---

[19] Ms. Antonopoulos filed proofs of claim 50-1 and 51-1. Proof of claim 50-1 evidences an outstanding loan balance of $54,997.26, secured by property located at 443 S. Street, NW, Washington D.C. 20001 and 920 Delafield Place, N.W. Washington D.C. Ms. Bertola is listed as the authorized agent for Ms. Antonopoulos on the proof of claim. Attached to the proof of claim is a deed of trust dated June 11, 2004, memorializing a $150,000 loan to Mr. Abell in exchange for a security interest in two properties. The deed was signed by Mr. Abell and notarized by Ms. Bertola. Also attached is an unsigned and undated deed of trust note dictating the terms of repayment.
Proof of claim 51-1 evidences an outstanding loan balance of $164,991.78, secured by property located at 6034 Eastern Avenue, NE, Washington D.C. 20010. Ms. Bertola is listed as the authorized agent for Ms. Antonopoulos on the proof of claim. Attached to the proof of claim is a deed of trust memorializing a second $150,000 loan to Mr. Abell in exchange for the security interest in the property, which is dated June 20, 2007. The deeds of trust is signed by Mr. Abell and notarized by Ms. Bertola.

[20] Ms. Bertola filed proof of claim 53-1 for $114,596.00. The claim is listed as contingent/guaranty of debt, and is not secured by any property or asset. Attached to the proof of claim is a modification of a note between 5907 Eads Street, LLC and Capital Bank, N.A. signed by Ms. Bertola and Mr. Abell, individually.

[21] American Trust filed proof of claim 55-1 in the amount of $750,000 based on contingent liability from the sale of properties.

[22] Mr. Gonzalez filed proof of claim 58-1 for $75,000 as a result of a loan he allegedly made to Mr. Abell. The loan is secured by property located at 1825 Kilbourne Place, NW, Washington, D.C.; 1360 Taylor St., NW, Washington, D.C.; and 1261 Owen Place, NE, Washington, DC. Attached to the proof of claim is a deed of trust entered into on June 3, 2009, between Mr. Gonzalez, Mr. Abell, and Ms. Bertola. The deed to the properties was signed by Mr. Abell and notarized by Ms. Bertola.

[23] Ms. Fela Bertola filed proof of claim 60-1 for $106,003.33 based on a series of loans she allegedly made to Mr. Abell. The loan is secured by property located at 5312 James Place, NE, Washington, D.C. Attached to the proof of claim is a deed dated April 20, 2007, signed by the Mr. Abell and notarized by Ms. Bertola.

amended complaint incorporates by reference the Trustee's objections to claim nos. 50, 51, 58, and 60.

On July 18, 2014, the court entered an order consolidating the Trustee's claim objections with this adversary proceeding.  ECF 658 in Case No. 13-13847.  The Trustee did not file an objection to Ms. Bertola's claim or American Trust's claim, but instead raises his objections in this adversary proceeding pursuant to Fed. R. Bankr. P. 3007(b).

Section 502(a) of the Bankruptcy Code provides that "a claim or interest, proof of which is filed under section 501, is deemed allowed, unless a party in interest . . . objects."  §502(a).  Section 502(b)(1) provides in pertinent part that the court shall determine the amount of a claim and shall allow such claim except to the extent that "such claim is unenforceable against the debtor or property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  §502(b)(1).  For non-insider creditors, the Bankruptcy Code provides a burden shifting process for resolving claim objections.  *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004).  When a creditor files a proof of claim, that claim constitutes *prima facie* evidence of the amount and validity of the claim.  Fed. R. Bankr. P. 3001(f).  The burden then shifts to the objecting party to introduce evidence to rebut the claim's presumptive validity.  *In re Gates*, 214 B.R. 467 (Bankr. D. Md. 1997).  If met, the claimant must ultimately prove the amount and validity of a claim by a preponderance of the evidence.

This burden shifting process likewise applies to the claims of insiders.  An insider's claim is entitled to the presumption of validity of Rule 3001(f).  *In re Harford Sands Inc.*, 372 F.3d at 641 (presuming the validity of an insider's proof of claim when it was filed); *see also In re Inter-Island Vessel Co., Inc.*, 98 B.R. 606, 608 (Bankr. D. Mass. 1988) (applying the presumption of

validity to an insider's proof of claim).  However, because of the influence and control an insider

may wield, an insider's transactions with a debtor are subject to rigorous or strict scrutiny.  *In re*

*Harford Sands Inc.*, 372 F.3d at 641.  The objecting party bears the burden of presenting material

evidence of unfair conduct.  *See id*.

In that event, the "burden is on an insider claimant to show the inherent fairness and good

faith of the challenged transaction."  *Id.*  As the Court stated in *Pepper v. Litton*, 308 U.S. 295,

306, 60 S. Ct. 238, 245, 84 L. Ed. 281 (1939), this burden does not apply until the objecting

party overcomes the *prima facie* effect of the claim.  Thus, claims alleged by an insider are

allowable "when honest and bona fide, but the bona fide must be demonstrated beyond cavil and

examined with a large measure of watchful care."  *In re Tri-O-Clean, Inc.,* 230 B.R. 192, 198-99

(Bankr. S.D. Fla. 1998).

In light of the foregoing standards, the first question is whether the allegations support a

determination that the defendants are insiders.  The Bankruptcy Code provides that certain

persons identified in §101(31) are insiders; they are often referred to as statutory insiders.  *See*

§101(31).  Once a person is determined to be a statutory insider, insider status is established and

there is no further need to assess the relationship between the debtor and the person.  *In re*

*Ponsen*, 2013 WL 5746118, at *7 (Bankr. E.D. Va. Oct. 22, 2013) ("For statutory insiders,

sometimes described as per se insiders . . ., the courts agree that once a party comes within the

definition of an insider, no further inquiry is necessary.").  Because the definition of insider

"includes" the entities identified in the statute, courts have determined that a person not

specifically identified in §101(31) can be an insider.  A non-statutory insider "may be any person

or entity whose relationship with the debtor is sufficiently close so as to subject the relationship

to careful scrutiny."  *Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996).  Insider status

is determined by "a factual inquiry into the closeness of the relationship between the parties and whether the transaction between the transferee and debtor was conducted at 'arm's length.'" *In re Three Flint Hill Ltd. P'ship,* 213 B.R. 292, 297-98 (D. Md. 1997) (finding that while control is certainly probative of an insider relationship, it is not required for finding insider status).

The allegations in the amended complaint state a claim that Ms. Bertola, Ms. Fela Bertola, and American Trust are insiders. Ms. Bertola is stated to be Mr. Abell's spouse, albeit separated. Ms. Fela Bertola is alleged to be Ms. Bertola's mother. A "relative" of a debtor is an insider, and the term "relative" is defined as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." §101(31)(A)(i); §101(45). As to American Trust, Mr. Abell is alleged to have been in control of it at all relevant times and also to have been its managing member. These allegations support the claim that it is a statutory insider under §101(31)(A)(iv). There are not sufficient facts in the amended complaint that support an allegation that Mr. Gonzalez or Ms. Antonopoulos are insiders.

The amended complaint alleges that the defendants' proofs of claim are based on sham or fraudulent transactions with Mr. Abell, and are therefore unenforceable under applicable non-bankruptcy law. Specifically, as to Ms. Fela Bertola, the amended complaint alleges that she filed a sham or fraudulent proof of claim based upon an undocumented loan she made to Mr. Abell, and in exchange received an allegedly phony deed of trust. As to Mr. Gonzalez, the amended complaint alleges that on June 30, 2009, Mr. Abell executed a deed of trust, prepared by Ms. Bertola, in favor of Mr. Gonzalez to purportedly collateralize a $75,000 loan to Mr. Abell, a loan, the Trustee alleges, that Mr. Gonzalez never made. In support of that allegation, the Trustee relies on Mr. Abell's Statement of Financial Affairs, which does not indicate that he

owes any money to Mr. Gonzalez.  As to Ms. Antonopoulos, the objection to claim, as incorporated by the amended complaint, alleges that the proofs of claim she filed are based on sham loans and that the deeds of trust she received in return are either invalid or fraudulent.  The allegations are sufficient to deny the motion to dismiss the Trustee's objections to the defendant's claims for both the insiders and non-insiders.  Accordingly, the motion to dismiss the Trustee's objection to these claims is denied to the extent it is based on §502(b)(1).

The Trustee also objects to these claims under §502(d).  It "requires a court to disallow an entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity, such as because of a voidable preference, but that entity has failed to first transfer this property back to the bankruptcy estate."  *In re Enron Corp.*, 379 B.R. 425, 435 (Bankr. S.D.N.Y. 2007).  In pertinent part, §502(d) provides:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or ruined over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

§502(d).  Section 502(d) has two purposes: "(1) to assure an equality of distribution of the assets of the bankruptcy estate, and (2) to have the coercive effect of insuring compliance with judicial orders."  *In re Enron Corp.*, 379 B.R. at 435.

The defendants argue that the plain language of §502(d) prohibits disallowance without a judicial determination that property is recoverable under one of the enumerated sections.  *See*, *e.g.*, *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1237 (1st Cir. 1997); *and Campbell v. United States (In re Davis)*, 889 F.2d 658, 662 (5th Cir. 1989).  The Trustee concedes that "[a]lthough the language of §502(d) is not implicated until the court has

made a determination that a particular transfer is avoided under one of the applicable statutory sections, the Trustee should not have to pursue a separate action for disallowance . . . ."  ECF 52 at p. 69 of 83.  He asks the court to first resolve his claims under §§544, 548, and 550 and then determine whether the claims should be disallowed under §502(d).

In light of the foregoing, the court will stay the Trustee's objections to these claims to the extent it is based on §502(d) until a determination is made on the Trustee's other claims against these defendants.  Any party may seek to terminate the stay upon filing an appropriate motion.

*Equitable Subordination*

In the alternative, the Trustee requests this court equitably subordinate the claims of these defendants.  The doctrine of equitable subordination was codified in the Bankruptcy Reform Act of 1978.  Section 510(c) provides:

> Notwithstanding subsections (a) and (b) . . . , after notice and hearing, the court may –
>
> 1.  under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> 2.  order that any lien securing such a subordinated claim be transferred to the estate.

§510(c).  The doctrine permits a bankruptcy court to "subordinate a claim or divest a secured creditor of its interest in collateral, if it finds that the creditor's claim, while not necessarily lacking a lawful basis, nonetheless results from inequitable behavior on the part of the creditor." *In re Ticketplanet.com*, 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004) (internal quotation and citation omitted).

When determining whether a claim should be equitably subordinated courts follow the three-pronged test set forth in *Matter of Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977).  Under *Mobile Steel*, a claim should be equitably subordinated if: (1) the claimant engaged in inequitable

conduct; (2) that misconduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) subordination is not inconsistent with other bankruptcy law. *Id.*

As to the first element, courts generally recognize three categories of inequitable conduct: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Matter of Missionary Baptist Found. of America, Inc.*, 712 F.2d 206, 212 (5th Cir. 1983). The severity of the conduct, however, depends on whether the claimant owed a fiduciary duty to or was an insider of the debtor.

> The burden and sufficiency of proof required are not uniform in all cases. Where the claimant is an insider or a fiduciary, the [plaintiff] bears the burden of presenting material evidence of unfair conduct.... If the claimant is not an insider or fiduciary, however, the [plaintiff] must prove more egregious conduct....

*In re Daugherty Coal Co., Inc.*, 144 B.R. 320, 324 (N.D. W. Va. 1992) (quoting *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986)). The cases are clear, however, that simply being an insider is not sufficient to warrant subordination. *In re Astroline Comm. Co.*, 226 B.R. 324, 329 (Bankr. D. Conn. 1998); *see also Comstock v. Group of Int'l Inv.*, 335 U.S. 211, 229, 68 S. Ct. 1454, 1463, 92 L. Ed. 1911 (1948) ("It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong.").

As stated above, the amended complaint contains sufficient allegations to support a claim that Ms. Bertola, Ms. Fela Bertola, and American Trust are insiders, but that there are not sufficient facts alleged to support an allegation that Mr. Gonzalez or Ms. Antonopoulos are insiders.

With respect to the *Mobile Steel* test, the court finds that the amended complaint states a plausible claim against all defendants.  First, the amended complaint alleges that Mr. Abell caused fraudulent transfers to be made to American Trust.  As discussed *supra*, the amended complaint is replete with facts alleging a scheme to transfer Mr. Abell's assets and real estate business with Ms. Bertola's assistance.  As to Ms. Fela Bertola, Mr. Gonzalez, and Ms. Antonopoulos, the Trustee has alleged, as discussed in the previous section, that each proof of claim is based on a fictitious or fraudulent loan.  Second, the amended complaint contains multiple allegations that would justify equitable subordination, including: (i) the creation of sham loans and deeds for the purpose of hiding and/or transferring assets to third parties; (ii) that such loans and deeds were used to hide or encumber assets from Mr. Abell's judgment creditors; and (iii) as a result, the judgment creditors' claims will most likely not be paid in full.

Accordingly, the motions to dismiss the Trustee's claims for equitable subordination are denied.

### J.   Disallowance of Secured Claim §506(d) – Count 37

In Count 37 of the amended complaint, the Trustee argues that the claims held by Mr. Gonzalez, Ms. Antonopoulos, Ms. Fela Bertola, American Trust, and Ms. Bertola should be disallowed under §506(d).  With exceptions not relevant here, §506(d) provides that "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."  §506(d).

Ms. Antonopoulos and Ms. Fela Bertola, both of whom filed secured claims, argue that their claims are based on legitimate transactions with Mr. Abell.  To the extent the motions are based on factual allegations, they will be denied.  The defendants also argue that the Trustee cannot use §506(d) standing alone to avoid their liens.  They rely on *In re Cunningham*, 246 B.R.

241 (Bankr. D. Md. 2000), for the proposition that §506(d) does not provide a stand-alone basis for avoiding a lien, but can only be used in combination with a lien-avoiding provision.

*Cunningham* does not apply here.  That case involved a request to strip off a wholly unsecured lien, and the court held that under *Dewsnup v. Timm*, 502 U.S. 410, 112 S. Ct. 773, 116 L. Ed. 2d 903 (1992), lien stripping is not available in Chapter 7.

Here, the Trustee is not seeking to avoid the defendants' liens based solely on §506(d).  The essence of the Trustee's contention in Count 37 is not that the liens should be avoided because they lack value in the *Dewsnup* sense, but because the claimants do not hold valid claims in the first place.  He bases this contention on his objections to the claims, as well as his claim for equitable subordination, both as addressed in Count 36 above.  Because the court concluded that the Trustee stated in Count 36 a plausible cause of action for disallowance of the claims, the court also finds that the Trustee has stated a plausible claim for voiding the liens under §506(d).  As such, the motions to dismiss this Count are denied as to all defendants.

*K.  Objection to Debtor's Discharge – Count 40*

In Count 40, the Trustee seeks the denial of the discharge of Mr. Abell.  The Trustee contends, among other theories, that Mr. Abell has transferred, removed, destroyed, mutilated or concealed property of the estate and financial information and records concerning numerous business transactions.  He also contends that Mr. Abell has knowingly and fraudulently made false oaths and withheld information relating to property or financial affairs.  The Trustee, contends, therefore, that the court should deny Mr. Abell a discharge pursuant to §§727(a)(2)-(5).  Mr. Abell contends that the Trustee has failed to state sufficient grounds for a complaint to deny a discharge, especially in light of the voluminous document production that Mr. Abell has undertaken.  His arguments are unavailing.  The court will deny the motion to dismiss Count 40.

Under Section 727 "the court shall grant the debtor a discharge" unless one of twelve exceptions is present. *See* §§727(a)(1)-(12). "Obtaining a discharge is the key component of the 'fresh start' a bankruptcy proceeding is designed to give a debtor." *State of Missouri ex rel. Nixon v. Foster (In re Foster)*, 335 B.R. 709, 714 (Bankr. W.D. Mo. 2006). To that end, "the provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor." 6 *Collier on Bankruptcy* ¶727.01[4] (15th ed. 2013). The party seeking the denial of the debtors discharge has the burden of proving the claim by a preponderance of the evidence. *Farouki v. Emirates Bank Int'l*, 14 F.3d 244, 250 (4th Cir. 1994). "Although the burden may shift to the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor." *Id.* at 249.

In the instant case the Trustee seeks denial of Mr. Abell's discharge pursuant to §§727(a)(2)-(5). "A party objecting to discharge need prove only one of the grounds for nondischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive." *Id.* at 250. Denial of a discharge pursuant to one provision of §727(a) eliminates the need for consideration of the remaining claims. *Id.* (citing *In re Shumate*, 55 B.R. 489, 495 (Bankr. W.D. Va. 1985); *see also In re Moore*, 89 B.R. 935, 937 (Bankr. M.D. Fla. 1988)).

Section 727(a)(2) requires that a debtor be denied a discharge if

(a) The court shall grant the debtor a discharge, unless--
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition[.]

§727(a)(2). Section 727(a)(2) "serves to deny a discharge when the debtor 'attempts to prevent

the collection of his debts by concealing or disposing of assets.'"  *In re Voccia*, 477 B.R. 625,

632 (Bankr. E.D. Va. 2011) (quoting *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr.

E.D.N.C. 1987)).  To bar a debtor's discharge under §727(a)(2)(A), the plaintiff must prove each

of the following elements by a preponderance of the evidence: (1) the debtor concealed, (2) his

property, (3) within one year of the bankruptcy petition's filing, (4) with the actual intent to

hinder, delay, or defraud a creditor.  *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 780

(Bankr. D. Del. 2002).  For §727(a)(2)(B), the debtor's concealment must be of property of the

estate after the commencement of the case.  It is often the case that direct evidence of a debtor's

intent usually will be unavailable.  Therefore, intent may be inferred from the circumstances

surrounding a debtor's objectionable conduct.  *Matter of Krehl*, 86 F.3d 737, 743-44 (7th Cir.

1996).  "The intent determination often will depend upon a bankruptcy court's assessment of the

debtor's credibility."  *Id.*

> Section 727(a)(3) requires that a debtor be denied a discharge if
>
> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

§727(a)(3).  "The essential requirement of § 727(a)(3) . . . is . . . that the records 'sufficiently

identify the transactions so that intelligent inquiry can be made of them.  The test is whether

there is available written evidence made and preserved from which the present financial

condition of the bankrupt, and his business transactions for a reasonable period in the past may

be ascertained.'"  *In re French*, 499 F.3d 345, 355 (4th Cir. 2007) (quoting *Meridian Bank*, 958

F.2d 1226, 1230 (3d Cir. 1992)).  The records of the bankrupt need not be perfect, however, the

debtor is under a statutory obligation to "preserve sufficient and adequate financial records to

enable the court and the parties to reasonably ascertain an accurate picture of his financial

affairs." *Id.*

As relevant here, §727(a)(4) requires a debtor's discharged be denied if the debtor

knowingly and fraudulently, in or in connection with the case

>  (A) Made a false oath or account;
>  (B) Presented or used a false claim;
>  (C) . . .
>  (D) Withheld from an officer of the estate entitled to possession under this
>      title, any recorded information, including books, documents, records,
>      and papers, relating to the debtor's property or financial affairs[.]

§727(a)(4). The purpose of §727(a)(4) is "to insure that debtor provides reliable information to

those with an interest in the administration of the debtor's estate." *Nerco Coal Corp. v. Ball*, 84

B.R. 410, 415 (Bankr. D. Md. 1988) (quoting *In re Ingle*, 70 B.R. at 983).

Under §727(a)(4)(A), to be denied a discharge, the debtor must have made a statement

under oath which he or she knew to be false, and must have made that statement willfully, with

intent to defraud. A debtor's false oath must have related to a material matter. *Williamson v.

Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987). "The subject matter of a false oath

is 'material' if it bears a relationship to the bankrupt's business transactions or estate, or concerns

the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* at

252 (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

Courts applying §727(a)(4)(B) "have required the plaintiff to prove that the debtor

'presented or used an inflated or fictitious claim.' Such cases generally involve the scheduling of

non-existent debts, the scheduling of inflated debts, or the filing by the debtor of a false proof of

claim." *In re Isaacson*, 478 B.R. 763, 792 (Bankr. E.D. Va. 2012) (quoting *Scheidelman v.

Henderson (In re Henderson)*, 423 B.R. 598, 619 (Bankr. N.D.N.Y. 2010)).

Under §727(a)(4)(D), the party objecting to the discharge has the initial burden of establishing that "1) the withholding of documents was done by the debtor or someone for whose conduct the debtor is legally responsible; 2) was in connection with a case; 3) was withheld from an officer of the estate entitled to possession; 4) was done knowingly and fraudulently; and 5) relates to the debtor's property or financial affairs." *In re Belk*, 509 B.R. 513, 521 (Bankr. W.D.N.C. 2014).

Lastly, the Trustee contends that Mr. Abell should be denied a discharge under §727(a)(5). That section provides that a debtor will be denied a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." §727(a)(5). "This statute gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re Ottoson-King*, 3 F. App'x. 147, 151 (4th Cir. 2001) (internal quotation and citation omitted). In an action brought under this section, the objecting party does not have to show that the debtor "acted knowingly or fraudulently in listing . . . assets or in with holding any information." *Id.* "Thus, a plaintiff need not plead with the particularity required for allegations of fraud under Federal Rule of Bankruptcy Procedure 7009. Nevertheless, the plaintiff must still identify particular assets which have been lost." 6 *Collier on Bankruptcy* ¶727.08 (15th ed. 2013).

In this case, the amended complaint is replete with allegations that Mr. Abell has transferred, removed, destroyed, mutilated or concealed property of the estate and financial information and records concerning numerous business transactions and knowingly and fraudulently made false oaths and withheld information relating to property or financial affairs. The Trustee has alleged that Mr. Abell transferred assets to prevent judgment creditors from

reaching them, that he failed to disclose on his Statement of Financial Affairs or on his schedules that he retains interests in certain entities, that he misrepresented the liens on certain assets listed on his schedules, that he has refused to provide discovery and has concealed information, and that he has continued to direct that income and revenue derived from the Remaining Concealed Assets be distributed to other defendants, even though they do not have equity interests in those assets. Accordingly, the Trustee has properly pled this cause of action and the allegations are sufficient to state a claim for objection to discharge under any of the enumerated sections. As such, the motion to dismiss Count 40 is denied.

*L.  Damages for Violation of the Automatic Stay – Count 43*

In Count 43, the Trustee alleges that a bankruptcy court order establishes that assets of MM-EBT of not less than $175,000 are property of the estate. He alleges that Mr. Abell and Ms. Bertola are in actual or constructive possession of the property, that he made demand to them to turnover the assets and they refused. He alleges their refusal is a violation of the automatic stay of §362. The defendants argue, among other things, that the assets of MM-EBT have not been sufficiently determined to be property of the estate.

The filing of a bankruptcy petition operates as a stay, as relevant here, of "(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." §362(a)(3). A party seeking to establish a violation of the automatic stay must establish, by a preponderance of the evidence, that (1) the defendant knew of the existence of the stay; (2) the defendant performed an intentional action; and (3) the action violated the stay. *See Brown v. Chesnut* (*In re Chesnut*), 422 F.3d 298, 302 (5th Cir. 2005); *In re Saunders*, 2014 WL 811734, *2 (Bankr. D. Md. Feb. 28, 2014); *In re Clayton*, 235 B.R. 801

(Bankr. M.D.N.C. 1998) (holding that the standard of proof is the preponderance of the evidence standard).

A violation of the automatic stay subjects the violating party to liability for damages, including punitive damages, but only if it is willful.  §362(k)(1).  Willfulness does not require the specific intent to violate the automatic stay, but only that the creditor knew of the stay and intentionally committed an act in violation of the stay.  *Citizens Bank of Maryland, v. Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994) *rev'd on other grounds*, 516 U.S. 16 (1995); *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292–93 (4th Cir. 1986).  A number of a cases have held that the failure to turnover estate property is a violation of the stay under §362(a)(3).  *See In re Del Mission Ltd.,* 98 F.3d 1147, 1151 (9th Cir. 1996) (holding that the automatic stay was violated when the state failed to repay taxes to the debtor in a timely manner after the bankruptcy court ordered that the taxes be refunded).

Here, the Trustee alleges that both defendants certainly knew of the existence of the stay, they performed an intentional act by refusing to turnover property that the bankruptcy court determined was not exempt and therefore was property of the estate, and that their actions violated the stay.  These allegations state a claim under §362.

Defendants raise other arguments, none of which are availing.  First, they contend that the Trustee does not have standing to request damages under §362(k)(1) because it provides that only "an individual" may recover damages for a willful violation of the stay.  *See* §362(k)(1).  In the Fourth Circuit, however, recovery under §362 is not restricted to a natural person.  *See Budget Serv. Co.* 804 F.2d at 292.  Other courts in this circuit have extended that to include trustees.  *See In re Fas Mart Convenience Stores, Inc.*, 318 B.R. 370, 375 (Bankr. E.D. Va. 2004) (permitted chapter 11 trustee to pursue a claim for damages under §362(h), the previous version

of §362(k)(1)); *Cohen v. Un-ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 810-11 (Bankr. E.D. Va. 1999) (held that a chapter 7 trustee can recover damages under §362(h)).  Second, the defendants argue that there is not an order under §542 upon which they could have violated the stay.  However, the bankruptcy court order determined the assets are not exempt.  Therefore, they have been judicially determined to be property of the estate.  A violation of a turnover order is not a prerequisite for alleging a stay violation under these circumstances.

The motions to dismiss Count 43 are denied.

## Conclusion

For the foregoing reasons, the motions to dismiss Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 19, 20, 21, 26, 27, 28, 29, 30, 31, 35, 36, 37, 38, 39, 40, 41, 42, and 43 are denied.  The motions to dismiss Counts 32 and 33 are granted.  Count 36 will be stayed to the extent it seeks disallowance of claims based on §502(d).  The court will enter a separate order.

cc:    All Parties
       All Counsel

## END OF MEMORANDUM OF DECISION