Date signed April 14, 2016



**THOMAS J. CATLIOTA**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   13-13847-TJC |
| Vincent L. Abell | * | Chapter   11 |
| Debtor | * | |
| *   *   *   *   *   *   *   * | * | |
| Roger Schlossberg, Chapter 11 Trustee | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  14-00417 |
| Vincent L. Abell, *et al.* | * | |
| Defendants | * | |
| *   *   *   *   *   *   *   *   *   *   *   *   * | | |

### <u>MEMORANDUM OF DECISION</u>

Plaintiff Roger Schlossberg, the Chapter 11 Trustee (the "Trustee"), filed two motions for

sanctions for spoliation of evidence against defendants Vincent L. Abell ("Mr. Abell"), Marta

Bertola ("Ms. Bertola"), and American Trust, LLC ("American Trust").  ECF 84, 108.[1]  The

Trustee has filed a 43-count amended complaint alleging that Mr. Abell, Ms. Bertola, and

numerous other related parties engaged in a systematic and ongoing fraudulent scheme to shield

their assets from the reach of creditors.  In the spoliation motions, the Trustee contends that these

---

[1] The Trustee originally brought the motion only against Mr. Abell and Ms. Bertola, but later filed motions against
defendant American Trust, *see* ECF 108, and defendants James Abell, Asset Lending Corporation, and numerous
other defendants.  ECF 109.  The Trustee has settled with a number of the other named respondents, and the
motions are now directed only to Mr. Abell, Ms. Bertola, and American Trust.

defendants also engaged in an ongoing, intentional effort to destroy electronically stored information ("ESI") in furtherance of their effort to shield assets from creditors' reach. Intervenor Maria Wilson ("Ms. Wilson") joins the motions. Ms. Wilson holds a fraud judgment against Mr. Abell dating to 2007 and has been seeking discovery from him and Ms. Bertola in state court litigation. Her effort, and the efforts of other claimants who have fraud judgments against Mr. Abell, has been continuously thwarted by the defendants intentional and repeated failure to comply with discovery obligations, as found by numerous courts. The Trustee asserts that there are nineteen court orders sanctioning the defendants for discovery abuse or directing them to comply with discovery obligations. Included among them is the order incarcerating Mr. Abell for failure to comply with discovery orders.

The Trustee and Ms. Wilson allege the defendants' destruction of ESI in this case is simply one more step in a long and continuous line of ongoing discovery abuses and abuses of the judicial process intended to keep Mr. Abell's assets out of the reach of his creditors. For the reasons set forth in this Memorandum, the court finds that Ms. Bertola, with Mr. Abell's knowledge and acquiescence, intentionally, willfully and repeatedly destroyed discoverable information for the specific purpose of keeping it from the Trustee and Ms. Wilson. The court also finds that, in doing so, Ms. Bertola acted on behalf of herself, Mr. Abell, American Trust, and other Abell-related entities. The court will grant the motions and, as sanctions, will enter judgment against Mr. Abell, Ms. Bertola, and American Trust and award attorney's fees and costs in favor of the Trustee.

## Statement of Jurisdiction

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. The court has

the inherent authority to sanction conduct that "abuses the judicial process." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). A bankruptcy court possesses this power in equal measure. *NEGT Energy Trading Holdings Corp. v. Orrick, Herrington & Sutcliffe LLP*, 2009 WL 902058, at *1 (Bankr. D. Md. Mar. 27, 2009) (and cases cited therein). *See also*, 11 U.S.C. §105(a) (Bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title" and may take any action or make any determination necessary or appropriate "to prevent an abuse of process.").

In resolving the spoliation motions, the court is entering final judgment against Mr. Abell, Ms. Bertola, and American Trust on counts in the adversary proceeding that raise statutorily core claims under 28 U.S.C. §157(b)(2)(A), (B), (E), (G), (J), (K) and (O). In *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), the Supreme Court held that there are claims over which a bankruptcy court has subject matter jurisdiction and statutory authority to hear, but which exceed the constitutional authority of a bankruptcy court to finally resolve. To the extent *Stern* applies to the judgments entered in resolving the spoliation motions, Ms. Bertola and American Trust have consented to the entry of final judgments in this proceeding. ECF 295, 296. *See Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015).

Mr. Abell has not consented to the entry of a final judgment. The court is entering judgment against Mr. Abell on Count 40, denying him a discharge under 11 U.S.C. §727. Count 40 raises a claim over which this court has both statutory and constitutional authority to resolve. The court is also entering judgment against Mr. Abell on Counts 1-6 and 19-21. These counts determine that certain assets are property of the bankruptcy estate, and they are statutorily core under 28 U.S.C. §157(b)(2)(A) and (E). Moreover, a number of courts have held that the

determination of what is property of the estate is within the authority of the bankruptcy court to finally resolve because it "stems from the bankruptcy itself." *Stern,* 131 S. Ct. at 2618.

> If every bankruptcy proceeding requires the "exercise of exclusive jurisdiction over all the debtor's property [and] the equitable distribution of that property among the debtor's creditors" a bankruptcy court must surely have the constitutional authority to determine what, is, and what is not, property of the bankruptcy estate, to order turnover of the estate property, and to determine whether another's interest in that property should be invalidated.

*In re Visser,* 2013 WL 1337327, *5 (Bankr. D. Idaho Apr. 1, 2013) (quoting *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363-364, 126 S. Ct. 990, 996 (2006)). *But see Wellness Intern. Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013) (bankruptcy court lacked constitutional authority to enter final judgment on an alter ego count, which claimed that assets held in trust were assets of the estate), *rev'd on other grounds,* 135 S. Ct. 1932 (Justices Roberts, Scalia, and Thomas dissented from the majority opinion stating that Article III presented no barrier to the bankruptcy court's authority to adjudicate the case because "[d]efining what constitutes the estate is the necessary starting point of every bankruptcy; a court cannot divide up the estate without first knowing what's in it.").[2]

### Procedural History

Mr. Abell filed a petition for chapter 11 relief on March 5, 2013. By order entered on August 27, 2013, the Trustee was appointed the Chapter 11 Trustee. ECF 231. On July 7, 2014, the Trustee commenced this adversary proceeding by filing a 102-page complaint, which was subsequently amended on August 13, 2014. The Trustee filed an emergency motion for sanctions for spoliation of evidence against Ms. Bertola and Mr. Abell on December 11, 2014.

---

[2] In the event that the District Court concludes that this court lacked authority to enter a final order or judgment consistent with Article III of the United State Constitution, and that consent was lacking by Mr. Abell, then, pursuant to Standing Order 2012-05 of the United States District Court for the District of Maryland, the court respectfully requests the District Court to treat this court's ruling with respect to Mr. Abell as proposed findings of fact or conclusions of law.

ECF 84.  The Trustee subsequently filed motions for sanctions for spoliation of evidence against American Trust.  ECF 108.  *See also supra*, n.1.

At an initial scheduling hearing, the court required the parties to submit an order directing the defendants to preserve evidence (the "Preservation Order").  The court entered the Preservation Order on January 12, 2015.  ECF 114.  The Preservation Order bars all defendants, including Mr. Abell, Ms. Bertola, and American Trust "during the pendency of this litigation from deleting, overwriting, or erasing any [ESI] in the possession, custody, or control of any Enjoined Person, wherever such ESI may reside."  *Id.* at ¶1.  The defendants are required to implement a litigation hold with the assistance of their forensic consultant, and to file detailed reports with the court concerning their compliance with the Preservation Order.  The Preservation Order remains in place.

The parties engaged in extensive discovery and the court held a four day trial on the motions in April 2015.  The parties submitted post-trial proposed findings of fact and conclusions of law, and closing arguments were held on June 25, 2015.[3]

### Findings of Fact

## Mr. Abell's Fraud

¶1. The Trustee characterizes Mr. Abell as a serial fraudster, and indeed it is difficult to dispute that characterization on the record before the court.  Mr. Abell has judgments against him for conducting so-called mortgage rescue scams.  At one trial, evidence was introduced showing he engaged in 100 such pre-foreclosure transactions.  *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 53 (D.C. 2010), cert. denied, 132 S. Ct. 111, 181 L. Ed. 2d 36 (2011).

---

[3] On January 21, 2016, the Trustee filed a motion for contempt against Mr. Abell and Ms. Bertola for their failure to comply with the court's Preservation Order.  The Trustee contends that admitted e-mail deletions by Ms. Bertola violate the Preservation Order and that the defendants should be further sanctioned for these continued violations.

¶2. As an example, on August 1, 2008, in *Cissel v. Abell ("Cissel")*, Case No. 262366-V, the Circuit Court for Montgomery County, Maryland, found that Mr. Abell engaged in a fraudulent mortgage rescue scheme that "constitutes extreme and outrageous conduct, and that Abell's intentional conduct caused severe emotional distress to [his victims]." Tr. Ex. 30 at 14 of 16. The Circuit Court determined that Mr. Abell knew his "scheme was fraudulent and acted intentionally" and with "malice." *Id.* at 15 of 16. It entered judgment for damages, punitive damages and attorneys' fees of $458,780. *See* Claim 4-1 at 3 of 8 (Bankr. Case No. 13-13847). The decision was upheld by the Court of Special Appeals. *Abell v. Cissel*, Case No. 900 (Md. Ct. Spec. App. June 24, 2010). In the instant bankruptcy case, the Honorable Paul Mannes determined that the *Cissel* judgment is non-dischargeable on the basis of Mr. Abell's fraud.

¶3. As another example, in *Wilson v. Abell*, Case No. 04-7270, Ms. Wilson obtained a judgment against Mr. Abell in excess of $2 million on April 13, 2007, in the Superior Court of the District of Columbia. *See* Claim 10-1 at 4-5 of 9 (Bankr. Case No. 13-13847). The judgment was $60,000 in compensatory damages, trebled under the District of Columbia Consumer Protections Act, and punitive damages of $2 million. *Id.* Judgment was also obtained against Mr. Abell's company, Modern Management Company ("Modern Management"), including punitive damages of $1.1 million. *Id.* The judgments were affirmed by the District of Columbia Court of Appeals. *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37. The judgments reflect damages for Mr. Abell's fraudulent mortgage rescue scam, which he perpetrated on Ms. Wilson. As the District of Columbia Court of Appeals held, "[c]learly, the conduct involved here – a scheme to dupe Wilson out of the title to the home she owned for twenty-two years and fought desperately to keep – was reprehensible." *Id.* at 54. At trial, evidence was introduced showing 100 similar pre-foreclosure transactions by Mr. Abell. *Id.* at 53. Judge Thompson's concurrence noted that Mr. Abell

"preyed on Wilson as a financially distressed and vulnerable homeowner, and for that [he] richly deserves the sting of a punitive damages judgment." *Id.* at 64. The Superior Court subsequently awarded Ms. Wilson an additional $428,520 in attorney's fees and costs, and judgment on that award was entered on December 13, 2012. Like the *Cissel* judgment, Judge Mannes also found that the *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, judgment was excepted from discharge because of Mr. Abell's fraud.

**Continuous Discovery Abuses and Disrespect of the Judicial Process**

¶4. As a result of their fraudulent activities, Mr. Abell and related entities faced numerous lawsuits. Their response, according to the Trustee, was twofold. First, the Trustee alleges that Mr. Abell, with the assistance of Ms. Bertola and others, engaged in a systematic, intentional and ongoing effort to shield his assets from the reach of their creditors, including those who held fraud claims. This effort included transferring valuable assets to Ms. Bertola and others while Mr. Abell retained the beneficial ownership of the assets. These claims are the subject of the Trustee's amended complaint in this adversary proceeding, which included 43 counts against 42 Abell-related defendants. In a nutshell, he alleges that

> [Mr. Abell] through his family members and close associates – has actively attempted to conceal from this Court, the bankruptcy estate, and his *bona fide* creditors millions of dollars' worth of properties and assets. . . . Abell has implemented a continuing scheme to camouflage his ownership of ongoing businesses and scores of properties and assets, manufacturing hundreds of phony transactions to create the appearance, on paper, that Abell is not the true owner, when in fact he is. . . . [D]espite his efforts to bury his ownership interests beneath layers of sham transactions, Abell maintains an ongoing beneficial interest in the businesses, properties, and assets described in this complaint and, accordingly, those businesses, properties, and assets must be recognized as part of the bankruptcy estate.

ECF 7 at ¶1. The amended complaint alleges that Ms. Bertola is Mr. Abell's estranged wife and that she actively engaged in a repeated pattern and practice of assisting Mr. Abell in furtherance

of the scheme to conceal assets and hinder creditors.  She is alleged to now hold the title to many valuable assets with beneficial interest remaining with Mr. Abell.

¶5. According to the Trustee, Mr. Abell's and Ms. Bertola's second response to the various lawsuits is a matter of fact, having been established by numerous court rulings.  They have repeatedly ignored and abused their discovery obligations, making it difficult if not impossible for adversaries to prosecute their claims or to collect judgments obtained as a result of the fraud.  Indeed, at the time of the hearing on this matter, Mr. Abell was incarcerated for contempt for violating discovery orders by the Superior Court of the District of Columbia.

¶6. The number of orders issued by various courts, and the findings made by those courts concerning discovery abuses by Mr. Abell and Ms. Bertola are astonishing:

    a. On May 27, 2005, in *Bilaal v. Abell, et al.* (Case No. 2004-CA-007225), the Superior Court of the District of Columbia (Judge Fisher) issued an order compelling Mr. Abell, Ms. Bertola, and Modern Management to produce "all documents containing financial information for the period January 1, 1999 to present" within 20 days of the date of the order.  Tr. Ex. 28.

    b. On August 1, 2008, in *Cissel* the Circuit Court for Montgomery County recited numerous discovery abuses by Mr. Abell that forced plaintiffs' counsel to "file motions, attend discovery dispute hearings, attend depositions for which Abell was inappropriately unprepared, constantly follow-up with discovery requests, extend office hours, make telephone calls and investigate and pursue alternative methods to obtaining the discovery already ordered to be produced by this Court."  Tr. Ex. 30 at 16 of 16.  The Circuit Court ruled that "[i]t was clear during the trial that some original documents were not provided until the middle of trial despite numerous

requests and orders to do so." *Id.* Consequently, the Circuit Court concluded that it

"intend[ed] to make a substantial award of attorney's fees as a sanction for

discovery abuse." *Id.*

c. On May 14, 2009, in *Williams v. Abell, et al.* (Case No. 2007-CA-06714-B), the

Superior Court of the District of Columbia issued an "Order Granting Motion for

Entry of Default [against Mr. Abell and Modern Management] for Failure to

Comply with this Court's Order Compelling Discovery Responses, Setting Case for

Ex Parte Proof of Damages, and Final Judgment against Defense Counsel Bertola

for Sanctions ($3,500) Imposed by the Court Entered on Docket 5/14/09." *See* Tr.

Ex. 27.

d. On April 19, 2011, John L. Davie, Special Assistant Attorney General of the Office

of the Attorney General for the District of Columbia sent a letter to Mr. Abell

detailing numerous discovery failures and abuses by Mr. Abell in *District of

Columbia v. Abell* (Case No. 2010-CA-006683B), Superior Court of the District of

Columbia. Tr. Ex. 87.[4]

e. On February 2, 2012, in *Wilson v. Abell* ("*Wilson*"), (Case No. 04-7270), the

Superior Court of the District of Columbia issued an Order granting

plaintiff/judgment creditor's motion to compel as to Mr. Abell. Tr. Ex. 98d. The

Order provides:

> Today's order only elaborates on why the defendant's position has
> always lacked merit. Having received this judicial disposition of
> his only objection through this Court's order of December 30,
> 2011, the defendant should have served his discovery responses as
> he was obligated to do so. He still refuses to do so. This approach

---

[4] Pursuant to a stipulation of counsel at the hearing (ECF 243 at 48), all of the Trustee's exhibits were deemed sent
to and received by the addressees reflected on those documents.

of the defendant does not weigh in his favor where the issue of compulsion is concerned.

*****

It is notable that the defendant did not respond to the discovery merely by asking for an extension of time, as he could have done if this had been the only issue. He simply refused to give any information. That pattern of behavior constitutes obstruction of the discovery process, and an order of compulsion is justified.

The Court concludes that there is no sound basis for the failure to produce the discovery requests, and the Court will grant the instant motion.

*Id.* at 6 and 8 of 10.

f.  On July 1, 2012, in *U.S. Bank, N.A. v. Hall* (Case No. 10 CA 0886 B), the Superior Court of the District of Columbia issued an Order denying Mr. Abell's motion to stay discovery and granting the plaintiff's motion to compel and for sanctions against Mr. Abell and others for discovery abuses. Tr. Ex. 29. In doing so, Judge Epstein determined:

Given these defendants' complete, consistent, and continuing failure to acknowledge, much less comply with, their obligations, an order to show cause would serve no useful purposes. The Court put these defendants [including Mr. Abell] on notice in its February 22 Order that it would impose sanctions if they did not produce their discovery responses by the date specified in that order. They do not contest [plaintiff's] representation that none of them complied.

Accordingly, the Court strikes their claims and defenses and precludes them from presenting any testimony or other evidence in support of any claims or defenses. No lesser sanction would be appropriate for a complete and continuing failure over an extended period, and despite numerous opportunities and warnings, to comply with their discovery obligations.

*Id.* at 3 of 5.

g.  On February 4, 2013, in *Wilson*, the court issued an Order Granting Plaintiff's Motion to Compel Asset Lending to Comply with the Subpoena. Tr. Ex. 57. In

the Order, the court describes Ms. Bertola's purposeful role in discovery abuses.

The court determined that:

> Abell often uses family members and other trusted persons to hold office in these related entities, in part to maintain paper debt that he does not actually repay (those so-called creditors being under his control). This is the problem that partly fuels the need for third-party discovery.
>
> *****
>
> The emails demonstrate that a professional process server delivered the subpoena to Bertola (registered agent for Asset Lending) on July 30, 2012.
>
> *****
>
> Subsequently, the purposeful nature of the refusal to comply was revealed in another email exchange between plaintiff's counsel and Bertola.
>
> *****
>
> The need for an order of compulsion is obvious, given the history of this case and the full sweep of events surrounding defendant Abell's approach to dodging his responsibilities in litigation. These details are set forth in the present motion and the copious Exhibits attached thereto. There is no doubt that Abell controls the business transactions that are at the heart of [defendant] and that those transactions systemically benefit Vincent L. Abell. Moreover, Bertola (Abell's wife) has revealed in her email that she takes direction from Abell as far as Asset Lending is concerned and is not going to comply with this subpoena in an unbiased manner. Thus, the non-party corporation has a clear motive to resist all of the plaintiff's subpoenas.
>
> *****
>
> Second, the Court has no reason whatsoever to think that imposing upon Abel[l] the personal responsibility for compliance with this subpoena will make any difference in what happens. He is already subject to a contempt proceeding, in which this Court will adjudicate whether he is to be incarcerated for failure to respond to discovery requests directed to him in his capacity as an individual defendant.

*Id.* at 3-5 of 7.

   h. On February 11, 2013, in *Wilson*, the court issued an Order Granting in Part and

   Denying in Part Plaintiff's Motion to Compel Marta Bertola to Comply with the

   Subpoena Served on Her and for a Finding of Contempt. Tr. Ex. 56. In the Order,

the court determined:

> **Response of Bertola to the Subpoena.** It is uncontested that Bertola produced nothing in advance of her deposition and that she produced only one document at the deposition itself.
>
> *****
>
> Significantly, Bertola admitted under oath that materials responsive to the subpoena are stored in the computers that she uses and that she has full access to such computers.
>
> *****
>
> Bertola's own admissions show that she actually had substantially more responsive material to divulge than the one document she brought to the deposition. At this point in time, given the nature of this lawsuit and similar suits brought against Abell and herself, and given her status as a member of the Bar, Bertola cannot be confused as to why the documents are important and why she has a duty to comply with the subpoena.
>
> Bertola's post-deposition behavior shows that her failure to comply the subpoena was at all times willful.
>
> *****
>
> [T]he instant motion contains a further reason why the non-compliance with the subpoena was not a mistake or the product of forces beyond the control of Bertola. Counsel for the plaintiff obviously has traced the FBI investigation of Abell and has communicated with the FBI regarding the cache of documents in question. Counsel learned that Bertola was being dishonest in claiming that the FBI raid was the reason why she had no documents to give to plaintiff's counsel. Exhibit M to the instant motion is a copy of a March 29, 2012 letter from the FBI to Abell, stating that the FBI no longer needed the seized documents and that they would be returned at Abell's convenience.
>
> *****
>
> As a member of the Bar, Bertola should know full well the potential impact of failing to oppose a motion of this nature. Likewise she and Abell are so experienced in litigation (as either counsel or litigants) that they cannot be confused about the consequences of not rebutting an opponent's arguments and information.[] Thus, it is stunning that Bertola has failed to dispute the content of the instant motion, particularly regarding the return of the documents by the FBI. The Court interprets these facts to be uncontested. They show a willful endeavor to avoid and evade compliance with the instant subpoena. Bertola has no credible excuse for failing to comply fully with the plaintiff's subpoena.

*Id.* at 3-5 of 7.

i. On March 1, 2013, in *Wilson*, Judge Long issued Findings of Fact and an Order of Contempt Against Defendant Vincent L. Abell.  Tr. Ex. 58.  In this Order, Judge Long describes the serial discovery abuses that led to the court determining that Mr. Abell should be incarcerated for his contempt.  Among other things, Judge Long determined that:

> Abell is not a neophyte [. . .] having litigated for several years against a highly motivated party and an aggressive legal team, he could not have been under any illusions about the consequences of ignoring a discovery order.  This Court infers that the refusal to comply with the orders of compulsion was intentional, in part because of Abell's prior history of intentional disobedience of such orders and his disinterest in the consequences.
>
> *****
>
> Abell's motive . . . has become rather transparent.  He is using every imaginable approach to avoid the payment of the money judgment in this case.
>
> *****
>
> Abell uses other persons and other entities to hide information to which the plaintiff is entitled.  A good example involves the litigation of plaintiff's Motion to Compel filed against a company known as Asset Lending Corporation.  The registered agent for that entity is Marta Bertola, the spouse of Vincent Abell.  In emails (appended to the plaintiff's Motion to Compel), she bluntly admitted that she withheld documentary discovery responses from the plaintiff, at the behest of Abell, even though she admitted having full control over the documents in question.
>
> *****
>
> The same result occurred recently with respect to the Motion to Compel filed against Bertola personally.  She is directly involved in Abell's business activities.  She failed to contradict the plaintiff's proof that she has had a digital collection of the relevant discovery documents for a very long time and that she has no basis for refusing to provide such discovery.
>
> *****
>
> All of this secondary discovery activity and the attendant orders of compulsion illustrate the lengths to which Abell will go in order to block the plaintiff from tracing his assets.  This is not conjecture.  His entire enterprise of evading the satisfaction of the judgment has become a virtual cottage industry.
>
> *****

> [T]his Court concludes that only incarceration will be an adequate, justifiable, and effective sanction.   Only the potential for incarceration will lead to compliance with the orders of compulsion.

*Id.* at 28-31.

j. After the Superior Court of the District of Columbia entered the order of contempt against Mr. Abell on March 1, 2013, and after Mr. Abell was incarcerated for contempt, the court permitted him to leave incarceration, temporarily for several hours during the day, from May 2014 to July 2014, so that he could go to his place of business and work on complying with the discovery orders and purging himself from contempt.

k. At a hearing held on July 16, 2014, before the Superior Court of the District of Columbia, Ms. Bertola admitted to trashing compact discs (CDs) that the Federal Bureau of Investigation (the "FBI") created as part of their investigation.  Tr. Ex. 21 at 31:22-23.  The FBI had seized business documents and imaged computers.  They scanned all the documents seized, and they provided Ms. Bertola with CDs of the scanned business documents.  At the hearing, Judge Nash stated:

> I am struggling to keep a forward-looking mentality.  I'm not even going to, you know, get into what could possibly be going through your head, Ms. Bertola, to throw away those disks.

*Id.* at 33:5-8.

l. In this bankruptcy case, this court has sanctioned Mr. Abell for discovery abuses in a proceeding filed by the Trustee and Ms. Wilson to determine his entitlement to certain claimed exemptions.  ECF 386 and 393 (Bankr. Case No. 13-13847).  As a sanction for failing to respond to the Trustee's and Ms. Wilson's discovery requests, the court determined that the facts related to the non-exempt status of

assets were established in favor of the Trustee and Ms. Wilson, and the court

rejected Mr. Abell's claims of exemption.  *Id.*  At the hearing on sanctions, Mr.

Abell blamed Ms. Bertola for refusing to cooperate with discovery.  *See* ECF 501 at

2 (Bankr. Case No. 13-1384) (the court referred to the debtor's testimony about his

estranged spouse's unwillingness to cooperate).  In a memorandum and order

denying the motion to stay the sanction orders pending appeal, the court determined

that Mr. Abell's "failure to make disclosures and cooperate were not in good faith

as reflected on the dreary record of noncompliance that he sought to excuse on his

more recent incarceration."  *Id.*  The court's orders were affirmed by the District

Court and the Fourth Circuit.  *Abell v. Wilson,* Case No. 14-cv-1037 (D. Md. July 3,

2014), *aff'd*, Case No. 14-1771, (4th Cir. Mar. 2, 2015) (unpublished per curiam).

**The Family Business and Ms. Bertola's Role**

¶7. Around 1993, Mr. Abell formed Modern Management, which he owned as 100%

shareholder.  Modern Management was a property management firm, and it also managed the

purchase, rehabilitation, and sale of real property for related entities.  It did not own property

directly; property was acquired by separate legal entities.  In 2007, Phoenix Real Estate, LLC was

formed, owned by Mr. Abell and Ms. Bertola, purportedly as tenants by the entirety, and it

succeeded to all of the assets and operations of Modern Management.  In 2012, Ms. Bertola

created Phoenix Real Estate II, LLC, of which she was the sole member.  It succeeded to all of the

assets and operations of Phoenix Real Estate, LLC.  In essence, Phoenix Real Estate, LLC took

over the business of Modern Management, and Phoenix Real Estate II, LLC took over the

business of Phoenix Real Estate, LLC.  As a result, all of the ownership value of Modern

Management was transferred from Mr. Abell, as its sole shareholder, to Ms. Bertola, as the sole shareholder of Phoenix Real Estate II, LLC.

¶8. American Trust is a limited liability company that was formed in 2004 by Mr. Abell and Ms. Bertola. It is purportedly owned by their four children. According to the operating agreement, Mr. Abell is named as the Permanent General Manager with full and exclusive right to manage the company. After Mr. Abell was incarcerated, Ms. Bertola became its general manager. Tr. Ex. 34 at 3-4; Tr. Ex. 89. Thus, at all times relevant to the spoliation motions, either Mr. Abell or Ms. Bertola was the managing member of American Trust

¶9. Modern Management, the Phoenix entities, American Trust, and the various affiliated entities that owned the real estate, are, to use Ms. Bertola's words, "the family business." ECF 243 at 103:9-10. She began working for Modern Management in 1987, and she has worked in the family business since then. Ms. Bertola continues to be employed by Phoenix Real Estate II, LLC.

¶10. Ms. Bertola is a well-educated, sophisticated businesswoman. She is a former member of the Maryland and District of Columbia Bars, having been suspended from both. While a member of the bar, she held herself out as general counsel for Modern Management, and then for Phoenix Real Estate, LLC. She has appeared as counsel of record in at least twenty Maryland cases, and at least fifteen cases on behalf of Abell-related entities in the Superior Court of the District of Columbia, and has, herself, been a party in multiple lawsuits. She has been involved in numerous discovery disputes in various cases, and, as described above, is the subject of several court orders concerning discovery abuses and compulsion. Through her experience as a lawyer and as a party litigant, she is very knowledgeable about discovery practices and obligations, and the obligations imposed on attorneys and parties engaged in litigation.

16

¶11. Among her other functions, Ms. Bertola organized the computer and document-filing systems for the family business. As established repeatedly at trial through her testimony and otherwise, Ms. Bertola has substantial computer-related skills and knowledge. She purchased the computers and computer-related devices for the Abell entities, including laptops, desktops, servers, external hard drives, thumb drives, and scanners. She understands these devices and how they are integrated into the overall system. She monitored their functionality, and hired computer specialists when needed. Ms. Bertola evaluated various business software programs and devices, and has the primary understanding of the evolution and current arrangement of the office's computer network systems.

¶12. Mr. Abell made it clear that he relied on Ms. Bertola to maintain the computers for the businesses, including ESI. For example:

> Q: Other than the records that are kept at Phoenix, at the Phoenix offices, are you aware of any other place where the records of the business and real estate matters that you were involved and were kept from the period 2012 to today?

> A: They're there, and then there's -- all the financial records are in the cloud now. Because [Ms. Bertola] switched it from being in the office to the directly, the way I understand it, in the cloud.

ECF 245 at 176:2-9. At all times relevant to the spoliation motions, Ms. Bertola maintained paper and electronic records, including maintaining and producing ESI, for Mr. Abell, herself, American Trust, and all of the other Abell-related entities that make up the family business.

**Notice of Duty to Preserve**

¶13. Since July 2, 2012, Ms. Bertola, Mr. Abell, and American Trust were repeatedly advised, not only in this bankruptcy case but in other civil proceedings, that they had a legal duty to preserve evidence, including ESI. The notice of their legal duty to preserve was included in written subpoenas, requests for production of documents, oral communication at depositions,

court directives at hearings and by issued orders, and through letters and email messages from counsel. There have been at least 11 explicit notices that they had a duty to preserve evidence and ESI.

¶14. On July 2, 2012, Ms. Wilson issued a subpoena to Ms. Bertola in *Wilson.* Tr. Ex. 98g. The subpoena sought wide ranging documents and ESI[5] from Ms. Bertola for all Abell-related entities, including American Trust and many named entities, as well as "[a]ny other company or entity owned in whole or part by Abell." *Id.* The subpoena was issued pursuant to an order entered by the Superior Court on June 25, 2012, authorizing Ms. Wilson to take discovery and to depose Ms. Bertola. That same order entered by the Superior Court also permitted Ms. Wilson to issue subpoenas *duces tecum* to American Trust, and a copy of that order was sent to Mr. Abell. Tr. Ex. 98f. Thus, no later than July 2, 2012, if not June 25, 2012, Ms. Bertola, Mr. Abell, and American Trust knew that Ms. Wilson was pursuing the discovery of ESI from all Abell-related entities.

¶15. At her deposition on July 23, 2012, Ms. Bertola confirmed that she understood that she needed to preserve all electronically stored evidence. She was asked "[a]nd you understand there is an obligation to preserve all electronically stored evidence[,]" and she answered, "I understand that." ECF 244 at 154:15-22. At the trial on the issue before this court, she offered an unconvincing nuanced explanation of her deposition answer, but later testified that she did in fact understand:

> Q: Okay, and back in 2012 when you were deposed in the Wilson matter, you understood that you had an obligation not to destroy evidence, correct?
>
> A: That's right--

---

[5] The subpoena defined the term document to include, among other things disk, cartridge diskette, information made by or stored in an electronic media, computer memory, data sheet or data processing card, and email.

ECF 245 at 65:13-19.

¶16. On July 26, 2012, Mr. Randall Ogg ("Mr. Ogg"), Ms. Wilson's counsel, sent a letter to Ms. Bertola and Mr. Abell advising them that he seeks ESI and that they are under a legal duty to preserve that evidence.

> You are advised of [Ms. Wilson's] intent to seek the imaging and discovery of the contents of the computers and other electronic storage devices used by each of you, professionally or personally, whether at your offices or residences.
>
> Please be advised that . . . you are under a legal obligation to preserve all such evidence.

Tr. Ex. 47.  At trial, Ms. Bertola denied  receiving the July 26, 2012 letter, ECF 244 at 153:5-23, but her testimony is not credible, and it is contradictory to a stipulation made by her counsel that permitted the letter to be admitted in as evidence.  *See* ECF 243 at 39:9-15, 57:24-25, 58:1-3. In any event, substantial other evidence exists that supports the finding that she understood she was under a duty to preserve ESI no later than July 2, 2012, and that she was well aware of that obligation.

¶17. Judge Edelman of the Superior Court of the District of Columbia conducted a hearing in *Wilson v. American Trust* (D.C. Super. Ct. Case No. 12-5778), on August 10, 2012. Tr. Ex. 98i.  Ms. Bertola appeared as counsel for American Security, LLC and Phoenix Real Estate, LLC.  During that hearing, the court directed that responses to requests for ESI would be due two weeks after the requests were received.  *Id.* at 14, 22-24.

¶18. On August 13, 2012, in *Wilson v. American Trust*, Ms. Wilson served her First Requests for Production of Documents to Mr. Abell, Phoenix 1, American Trust, and  American Security, which sought the discovery of ESI.  Tr. Ex. 98j.  The requests, which included ESI, were served  on Mr. Abell and on Ms. Bertola as counsel for Phoenix 1 and American Security.

¶19. On August 30, 2012, in *Wilson v. American Trust*, Ms. Wilson's counsel

sent a letter to Ms. Bertola raising concerns about compliance with ESI discovery,  reminding

Ms. Bertola of the duty to preserve ESI, and advising:

> I would ask your assurances that no one is attempting or has attempted to change, alter, or "correct" the electronically stored information ("ESI") and that all persons associated with the Defendants in this matter have been advised against any such actions.  Under the relevant case law, counsel now has this obligation.

Tr. Ex. 47 (emphasis in original).  Ms. Bertola acknowledged that she received the August 30,

2012 letter.  ECF 244 at 155:12-19.

¶20. On September 20, 2012, in *Wilson v. American Trust*, Judge Edelman issued the

2012 Imaging Order, which provided:

> On or before September 25, 2012, Defendants American Trust, LLC, American Security, LLC, Phoenix Real Estate, LLC, and Vincent Abell shall allow the ESI  forensic consultant (who shall be identified to all parties) retained by the Plaintiff to image all the  hard drives (whether internal or external) of all computers used by any of those parties.  These shall include all computers identified by Marta Bertola during her July 23, 2012 deposition[.]
> *****
> Defendants shall have until October 2, 2012 to extract and exclude the following files which are non-responsive by their very nature: . . . (c) personal files and folders  not included in the discovery requests referenced in paragraph (2) above.
> *****
> By that same date, Defendants shall, with the assistance of a qualified ESI consultant, extract any other file or data that is privileged or non-responsive . . . and produce the  balance of the collected data to Plaintiff's counsel or Plaintiff's ESI consultant.
> *****
> Defendants shall by October 2, 2012 clearly and expressly identify all documents that have been extracted from the production and shall state with particularity the  basis for the exclusion in sufficient detail so that the Plaintiff and the Court can evaluate whether  there is a sound basis for the exclusion.

Tr. Ex. 59 at 2-3.

¶21. Once Mr. Abell filed this bankruptcy case in 2013, the defendants were again explicitly told of their duty to preserve documents, including ESI.  On July 3, 2013, Ms. Wilson's counsel sent letters to Ms. Bertola, American Trust c/o Ms. Bertola, and a number of other Abell–related entities.  Tr. Ex. 2.  The letters reminded each person of their duty to preserve evidence:

> This letter requests your immediate action to preserve both evidence relating to your business dealings with Vincent Abell and any entity related to Vincent Abell.  This includes evidence which is in paper form . . . and electronically stored information that may contain evidence important to the above-referenced legal matter.

> This notice applies to your on- and off-site computer systems and removable electronic media plus all computer systems, services, and devices (including all remote access and wireless devices) used for your overall operation . . . .

> Further, this notice applies to archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail and other data.  All operating systems, software, applications, hardware, operating manuals, codes, keys and other support information needed to fully search, use, and access the electronically stored information must also be preserved.

> The importance of immediate action cannot be overstated.  Electronically stored information is easily corrupted, altered, and deleted in normal daily operations.  Even booting a drive, running an application, or reviewing a document can permanently alter evidence.  An important method for preserving data in its original state is to have a forensic image (mirror image or clone image) made of pertinent hard drives of both office and home computers used for business, and of network servers.  This image captures all current data, including the background or metadata about each document.  Simply copying data to a CD-ROM or other common backup medium is not adequate.

> This preservation notice covers the above items and information between the following dates: March 27, 2007 to the present.

> Current law and rules of civil procedure clearly apply to the discovery of documents and electronically stored information just as they apply to other evidence, and confirm the duty to preserve such information for discovery.

> You must take all reasonable steps to preserve this information until this legal matter is finally resolved.  Failure to take the necessary steps to preserve the information addressed in this letter or other pertinent

> information in your possession or control may result in sanctions or
> penalties.

*See e.g.*, Tr. Ex. 2.

¶22. On December 12, 2013, in the main bankruptcy proceeding, this court entered an order granting Ms. Wilson's motion to compel compliance with discovery requests (in which the Trustee joined), and ordered Mr. Abell to produce evidence, including specifically-requested ESI. *See* ECF 281, 300, and 323 (Bankr. Case No. 13-13847). Prior to the motion to compel being filed, the Trustee's counsel and Mr. Abell's counsel had already communicated through emails sent on September 30, 2013, and October 7, 2013, about the deficiencies in Mr. Abell's and Ms. Bertola's document deliveries. Tr. Exs. 3 and 4.

¶23. In January 2014, this court granted the Trustee's motions for Rule 2004 examination subpoenas of Ms. Bertola, American Trust and its members, among others. *See* Orders, ECF 339, 346, 358 (Bankr. Case No. 13-13847); ECF 243 at 91-92. On March 6, 2014, the Trustee issued those subpoenas and each required that the recipient produce ESI, including: "All electronic mail, text messages, voice mail and/or facsimile messages sent or received by [her] for the period of January 1, 2007 to present." Tr. Ex. 9 at 20 of 27; Tr. Ex. 10 at 16 of 16; Tr. Ex. 11 at 19 of 19; and Tr. Ex. 12 at 15 of 16.

**Intentional Spoliation of ESI**

¶24. In May of 2011, Mr. Abell and Ms. Bertola moved the family business from 6925 4th Street NW, Washington, D.C. to 6328 Eastern Avenue NE, Washington, D.C. Ms. Bertola hired Cristhian Morales ("Mr. Morales") to set up the telephone system and computer network at the new location. Mr. Morales's business provides computer services to small businesses. Shortly thereafter, he suggested to Ms. Bertola that the computers could use a tune-up and she authorized

him to do so.  He performed very generic and standard services to make sure the computers were working 100%.

¶25. As part of his service, Mr. Morales installed several programs, including CCleaner, MalwareBytes,[6] and AVG.[7]  He installs CCleaner because he believes it helps the computer run faster.  He installs the free version, intended for personal, not commercial, use because it is sufficient for his purposes.  In his view, running CCleaner is something that needs to be done about once a year, like an annual checkup for a car.  CCleaner cleans temporary files, history, cookies, download history, in Internet Explorer, Firefox, Google Chrome, Safari, and other supported internet browsers.  *Id.*

¶26. When Mr. Morales installed CCleaner on defendants' computers, he did not customize the CCleaner options, but rather left the default settings in place.  He did not use any of the other non-default features available in CCleaner.  When used in the default mode, CCleaner destroys categories of data such as internet history, the "most recently used" cache, temporary files, and anything in the recycle bin.  Mr. Morales did not discuss CCleaner with Ms. Bertola, did not teach her how to use it, nor did she ask him how to use it.  ECF 245 at 36, 56.  Mr. Morales was unaware that anyone other than he had deployed CCleaner during the time he did work for Ms. Bertola.

¶27. The Wipe Free Space feature is an "advanced option" of CCleaner, and it is not part of the default settings.  When the Wipe Free Space feature is activated, CCleaner is far more destructive.[8]  Wipe Free Space destroys data in a manner that renders it permanently unrecoverable; it allows a user to permanently delete not only the access to data, but also the data

---

[6] MalwareBytes is a malware detection and prevention program.  ECF 242 at 156:18-25.  Malware takes up computer resources and can cause harm to the computer.  *Id.*
[7] AVG is an anti-virus program.
[8] Free space is the part of a computer hard drive in which new data may be written.  Tr. Ex. 1 at 4.  It is also where deleted data is located.  *Id.*

itself, as well as any record of the data.  Wipe Free Space writes over the files with a string of letter ZZZs, making them permanently unrecoverable.  Tr. Ex. 1 at 4.  As the Trustee's expert testified, "not only does [Wipe Free Space] go through and delete files, it goes through, deletes it and then overwrites it so that you can't tell what had been deleted."  ECF 242 at 76:12-15.  Any files in the recycle bin or any data in the unallocated space of the computer, and any metadata about those files, are permanently destroyed.  *Id.*  This type of deletion is effective because the data portion of a file is overwritten and unrecoverable and it will also overwrite deleted file records, which includes information such as file name, timestamps, and file attributes.  *Id.*  Once Wipe Free Space has been run, there is nothing that can be done to decipher what data has been wiped.  *Id.* at 84.  The use of Wipe Free Space can even erase the data that shows when CCleaner was run.  ECF 245 at 129-30.

¶28. The defendant's expert witness, Mr. Michael Maschke testified that Wipe Free Space is not a feature used for computer maintenance.  *See id.* at 128:12 -14.  The Trustee's expert testified that Wipe Free Space does not optimize a hard drive, and based on the memory storage capacity of the hard drives he examined, Wipe Free Space and CCleaner would have no benefit because those hard drives had ample storage capacities.  ECF 243 at 18:12-24.  Contrary to Ms. Bertola's testimony, there is nothing in the record that indicates that the hard drives examined were close to memory storage capacity or that they were operating poorly because of memory storage.

¶29. Ms. Bertola discovered that CCleaner had been installed.  She read through the various options and changed the settings from the default settings, to include all the options boxes available in CCleaner, including the Wipe Free Space option.  When she did this she understood the significance of the options, and the significance of changing the options from the default

settings because various warnings alerted her to the dangers of using CCleaner. For example, CCleaner warns the user that "This process will permanently delete files from your system. Are you sure you wish to proceed?" ECF 242 at 79:1-5; Tr. Ex. 1 at 22 of 24. An additional warning also pops up on the screen when the Wipe Free Space option is selected, which states that "Wiping free space will significantly increase the amount of time the cleaning takes. We recommend that you leave this disabled for normal usage." *Id.* at 78:17-22; Tr. Ex. 1 at 20 of 24. Ms. Bertola purposefully disabled these warnings for CCleaner and its Wipe Free Space feature, which establishes that she understood the warnings. She never told Mr. Morales that she was using CCleaner or that she changed the default settings.[9]

¶30. Ms. Bertola admitted to Mr. Abell and a part-time bookkeeper that she used a program to clean the computers for information she did not want Ms. Wilson to get. Mosta Fallahkhair, who also goes by the name of Michael Falla, began working for Mr. Abell in 1991. He left for another job in 1992, but continued to work as a part-time bookkeeper after that. In 2012, he was performing bookkeeping services for the family business, and he mainly reported to Mr. Abell. ECF 243 at 25:22-26:1. He learned that Mr. Ogg, who represented Ms. Wilson, was in the process of obtaining forensic images of the computers for the family business. One evening, he, Ms. Bertola and Mr. Abell were discussing the order Mr. Ogg had obtained to take the electronic images of the computers. Ms. Bertola said explicitly that she used a program to clean up all the computers for the information that she did not want Mr. Ogg to have. Mr. Falla described the exchange "as not a pleasant conversation." ECF 243 at 26:24-25. Thus, Ms. Bertola was deleting files while she was under a legal duty to preserve ESI, and Mr. Abell knew it.

---

[9] Mr. Morales's testimony on these points was clear. Ms. Bertola's testimony was not credible in general and on this point in particular for a number of reasons, including that it contradicted Mr. Morales. Other testimony that raised serious questions about Ms. Bertola's credibility is outlined in the Trustee's and Ms. Wilson's post-trial briefs.

¶31. Several months later, the topic came up again.  He said to Ms. Bertola that she should not be worried about the information Mr. Ogg was seeking because "you already cleaned up all the information before Mr. Ogg take [sic] the images."  *Id.* at 27:8-11.  Ms. Bertola denied previously making that statement, but when Mr. Falla reminded her of the prior conversation, she did not say anything.  *Id.* at 27:14-15.

¶32. Subsequently Mr. Falla mentioned to Mr. Abell the statement Ms. Bertola made about deleting files, and said words to the effect that this was not good news, or that it was not a good sign.  Mr. Abell did not dispute that this conversation occurred, and there is no evidence that he attempted to cease the destruction of the requested evidence.  Mr. Falla, obviously, was uncomfortable with what he heard.  He subsequently stopped doing bookkeeping service for the family business after speaking with his attorney.

¶33. In 2012 and 2014, Ms. Bertola used CCleaner and the Wipe Free Space feature frequently to destroy data in the computers of the family business despite being warned that she had a legal duty to preserve the very data she was destroying.  Ms. Bertola's usage of CCleaner and the Wipe Free Space feature coincides with discovery motions and orders from courts, including this one, requiring her to turn over ESI.

¶34. As described earlier, on September 20, 2012, Judge Edelman had issued the 2012 Imaging Order, which ordered that a forensic consultant be retained to image all hard drives, internal or external, of all parties, and for that image to be taken by September 25, 2012.  Tr. Ex. 59 at 2-3.  Imaging a hard drive means collecting a complete forensic image of that hard drive. ECF 242 at 49:22-25 and 50:1-12.  Clicks was the forensic company that imaged the parties' hard drives in 2012, pursuant to the court order.  ECF 243 at 166:24-25.  They imaged 10 computers and delivered to Ms. Bertola an external hard drive that contained all 10 images.  *Id.* at 168:3-8.

The images of those hard drives are referred to by the parties as "Clicks #". Each hard drive had its own designated number assigned to it. Mr. Ogg received the images from Ms. Bertola in November 2012.

¶35. The images of these hard drives show that leading up to and around the time of the imaging of the defendants' computers in 2012, Ms. Bertola used CCleaner and/or the Wipe Free Space feature. It was also during this time that Ms. Bertola had received at least six written or oral notices that Ms. Wilson sought ESI from the parties and that Ms. Bertola had a legal duty to preserve it. *Supra.* Ignoring her duties, Ms. Bertola destroyed ESI using Wipe Free Space on the following dates and on the following identified devices:

- August 13, 2012, Clicks 3. ECF 242 at 99:8-13.
- September 21, 2012, Clicks 9. *Id.* at 99:22 to 100:5; Tr. Ex. 85, Hendershott Supplemental Declaration, Ex. A.
- September 23, 2012, Clicks 7. ECF 242 at 100:6 to 101:2; Tr. Ex. 85, Hendershott Supplemental Declaration, Ex. A.
- September 24, 2012, Clicks 2, 3, and 7. ECF 242 at 89, 100:6 to 101:2-10; Tr. Ex. 85, Hendershott Supplemental Declaration, Ex. A.
- September 25, 2012, Clicks 7. ECF 242 at 100:6 to 101:2; Tr. Ex. 85, Hendershott Supplemental Declaration, Ex. A.

¶36. The Trustee's expert explained that upon examination of the imaged hard drives, he found numerous ZZZ files created on specific dates, which signify that CCleaner with the Wipe Free Space feature was used on that date. These artifacts or evidence, also referred to as the ZZZ files, are what is left behind when Wipe Free Space feature is used. It is the only evidence that remains of a specific file or data unit that was deleted with Wipe Free Space.

¶37. Subsequently, during the pendency of Mr. Abell's bankruptcy case, Ms. Bertola stalled the turnover of ESI again, while she continued to destroy evidence, with the knowledge

that she had a continued legal duty to preserve.  *Supra.*  These acts coincided with the Trustee's requests and the court's order to turn over ESI.  First, on April 30, 2014, Ms. Bertola appeared for her  2004 examination and she failed to produce any of the requested documents or images for herself or American Trust.  ECF 244 at 166; ECF 590 (Bankr. Case No. 13-13847).  The Trustee had issued subpoenas on March 6, 2014, supplying Ms. Bertola with ample time to prepare the requested documents and images.  *Supra.*  Second, on May 7, 2014, the Trustee filed a motion for  contempt, seeking sanctions for Ms. Bertola's and American Trust's failures to comply with the  subpoenas.  ECF 590 (Bankr. Case No. 13-13847).  Ms. Bertola testified that she had put away and forgotten about the  subpoenas that were served on her, but that after the Trustee filed the motion for contempt, Ms.  Bertola decided to retain counsel, who advised her that she was legally obligated to provide images of her computers.  ECF 244 at 165-67.  Third, on May 22, 2014, the Trustee, American Trust,  and Ms. Bertola entered into a Consent Order Resolving the Trustee's Motion for Contempt, which provided that she would  produce documents in response to the subpoenas on or before June 15, 2014.  ECF 612 at 2-3 (Bankr. Case No. 13-13847); ECF 244 at 168.  Fourth, in June 2014, after the Trustee's counsel expressed concern about the delays in receiving the imaging, she misrepresented through her own counsel that she was meeting with a forensic image consultant.  Tr. Ex. 17.  Fifth, after repeated requests from the Trustee and clear communication of their concerns that data was being spoliated, she denied Ricoh International[10] access to her computers on July 3 and 7, 2014.  Tr. Ex. 20b at 4-9.

¶38.  During this ongoing delay, Ms. Bertola destroyed ESI using Wipe Free Space and/or CCleaner on at least sixteen different occasions and on several different devices.  Ultimately, on

---

[10] The parties engaged Ricoh International in the summer of 2014 to obtain images of the defendants' computers. Mr. David W. Hendershott examined and analyzed the images obtained.  He testified at the trial, as the Trustee's expert witness.  He also issued a declaration containing his findings.  Tr. Ex. 1.

July 14, 15, 18 and August 5, 2014, Ricoh obtained images of all the electronic devices available. The images of those hard drives are referred to by the parties as "Ricoh #". Each hard drive had its own designated number assigned to it. Some of those devices were also imaged in 2012. The record shows that data was deleted on the following dates in 2014, and on the following devices:

- March 9, 2014, Ricoh 001, 002. ECF 242 at 81, 84-85; *see also* Tr. Ex. 1, Hendershott Declaration, Ex. D, ECF No. 84-1 at 24.
- May 11, 2014, Ricoh 004. ECF 242 at 85:13-23.
- June 1, 2014, Ricoh 001, 002, and 004. *Id.* at 81, 84-85.
- June 2 and 9, 2014, Ricoh 011. *Id.* at 88:5-17.
- June 10, 2014, Ricoh 006. *Id.* at 86:24 to 87:6.
- June 18 and June 20, 2014, Ricoh 013. *Id.* at 88:21 to 89:16.
- June 21, 2014, Ricoh 001. *Id.* at 81.
- June 23, 2014, Ricoh 002 and 004. *Id.* at 84:18 to 85:2, 85:13-23.
- June 26, 2014, Ricoh 006. *Id.* at 86:24 to 87:13.
- June 30, 2014, Ricoh 005. *Id.* at 86:12-23.
- July 1, 2014, Ricoh 011. *Id.* at 88:5-17.
- July 5, 2014, Ricoh 005. *Id.* at 85:13 to 86:23.
- July 12, 2014, Ricoh 004. *Id.*
- July 22, 28, and August 3, 2014, Ricoh 013. *Id.* at 89:12 to 90:12; Tr. Ex. 322.[11]

¶39. Despite Ms. Bertola's testimony to the contrary, there is no way of knowing if there is a duplicate of anything that was deleted. At trial, defendants' own forensic expert, Mr. Maschke, testified that Ms. Bertola and the other defendants cannot prove that anything she has deleted was merely a duplicate of a still-existing file:

> Q: When you were initially retained you were also asked to determine whether there was a way to identify what had been deleted, isn't that right?
> A: Yes.
> Q: And the answer to that is no, right?
> A: Correct.

---

[11] The initial attempt to image this device failed. On August 5, 2014, Ricoh obtained a new image.

> Q: And that's because CCleaner has rendered a good portion of the deleted files unrecoverable, right?
> A: Yes.

ECF 245 at 124:25–125:8.  Mr. Maschke also testified:

> Q: Now, with respect to the ZZZ entries on the deleted file records, those are the artifacts of files that were used to overwrite everything that was in the unallocated space of the computer, right?
> A: Yes.
> Q: And that happened when the wipe free space feature was used, right?
> A: Yes.
> Q: And once the file is overwritten by those files there's absolutely no way to figure out what it was, right?
> A: Correct.
> Q: And any hash values that existed in connection with those files is gone forever, right?
> A: Correct.

*Id.* at 127:13-128:1.  The Trustee's forensic expert confirmed the conclusion that there is no way to show that only duplicate files were wiped.  He testified that "not only does [CCleaner and the Wipe Free Space feature] go through and delete files, it goes through, deletes it and then overwrites it so that you can't tell what had been deleted."  ECF 242 at 76:12-15.

**Other Spoliation Efforts**

¶40. In addition to the use of the Wipe Free Space feature of CCleaner, Ms. Bertola undertook numerous efforts at spoliation ("Other Spoliation Efforts").  The defendants argued that none of the Other Spoliation Efforts prejudiced the Trustee because either the evidence is available elsewhere (an allegation that was often said but rarely established) or some other reason.  The Other Spoliation Efforts are completely inconsistent with and contrary to the duty to preserve evidence that Ms. Bertola was under at the relevant times.

- Dropping and subsequently throwing away an external hard drive, identified as "MyBook," before it could be imaged.  ECF 244 at 198:21 to 199:6, and 201:4-10.

- Failing to turnover identified thumb and flash drives that Ms. Wilson contends were never turned over or produced for imaging.  These drives are identified as The Data

30

Traveler C-10 Flash Drive (s/n – 0726) and The Data Traveler C-10 (s/n 072A).  ECF 263 at 29-31.

- Failing to turnover a Seagate external hard drive, identified as SeaGate Backup Plus (s/n NA5KFJ2Z), which is missing and was never produced to the Trustee nor provided by Ms. Bertola to Sensei Enterprises.[12]  ECF 244 at 31-37.

- Failing to produce the hard drive used on the PRE server, which was replaced on December 5, 2013, mid-litigation, and given to her by Mr. Morales.  ECF 245 at 59:15-25, and 60:1-4.  The Trustee contends that the Defendants have not made the hard drive available to any of the experts and that it has not been identified in any preservation affidavit submitted by Sensei Enterprises.  ECF 265 at F40.

- Reformatting or replacing the operating systems on her laptop and desktop computers in 2014, just prior to the imaging.  ECF 242 at 108:10-16; ECF 242 at 109:24 to 110:5; Tr. Ex. 226 at 4.

- Reinstalling data on her computers after reformatting the operating systems, allowing her to self-select the data that would be saved on the computers.  Tr. Ex. 344; Tr. Ex. 350.

- Making massive deletions of user-created data prior to imaging in both 2012 and 2014 on numerous computers, including her office desktop and Mr. Abell's computer. ECF 242 at 69:11 to 72:20; Tr. Ex. 300-315.

## Conclusions of Law

The Trustee contends that defendants engaged in an ongoing, deliberate effort to destroy evidence.  He argues that their conduct is so egregious that the entry of judgment is necessary against Mr. Abell, Ms. Bertola, and American Trust for their role in the spoliation of evidence. He also seeks an award of attorneys' fees and costs.  The defendants contend that any spoliation occurred in the ordinary course of using CCleaner by Ms. Bertola and no sanctions are warranted.

---

[12] On January 12, 2015, the court entered an Order Directing Defendants to Preserve Evidence.  ECF 114.  In the order, the court directed the defendants to consult with Sensei Enterprises and implement the litigation hold as described in the order.  *Id.*

The Fourth Circuit defines spoliation to mean "the destruction or material alteration of evidence or . . . the failure to preserve properly for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri*, 271 F.3d at 590.  A court derives its authority to impose sanctions for spoliation from one of two sources. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010) (citing *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009)).  First, the court has an "inherent power to control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process.'" *Id.* (quoting *Goodman*, 632 F. Supp. 2d at 505-06).  *See also*, 11 U.S.C. §105 (Bankruptcy court has authority to take any action or make any determination necessary or appropriate "to prevent an abuse of process.").  Second, the court may impose sanctions if the spoliation violates a direct court order.  *Victor Stanley,* 269 F.R.D. at 517.  Here, the Trustee primarily seeks relief based on the court's inherent power to regulate the judicial process.

It is well established in the Fourth Circuit that the party seeking to prove a spoliation claim must show:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Id.* at 520-21 (quoting *Goodman*, 632 F. Supp. 2d at 509).  The court will address each element.

### 1.  Duty to Preserve Evidence

First, the court must consider whether the alleged spoliator had a duty to preserve the lost evidence, and if so, were the actions taken in breach of that duty.  "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation

when a party reasonably should know that the evidence may be relevant to anticipated

litigation." *Silvestri*, 271 F.3d at 591 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d

Cir. 1998)).  *See also Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013).  Once a party

reasonably anticipates litigation a mandatory litigation hold goes into place.  The implementation

of the litigation hold suspends the "routine document retention/destruction policy" of relevant

documents.  *Goodman*, 632 F. Supp. 2d at 511 (internal citation omitted).  The court in *Goodman*

defined "relevant documents" to include:

> [A]ny documents or tangible things (as defined by [Fed.R.Civ.P. 34(a)) ]
> made by individuals "likely to have discoverable information that the
> disclosing party may use to support its claims or defenses." The duty also
> includes documents prepared *for* those individuals, to the extent those
> documents can be readily identified (*e.g.,* from the "to" field in e-mails).
> The duty also extends to information that is relevant to the claims or
> defenses of *any* party, or which is "relevant to the subject matter involved
> in the action." Thus, the duty to preserve extends to those employees
> likely to have relevant information—the "key players" in the case.

*Id.* at 511-12 (emphasis in original) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212,

217-18 (S.D.N.Y. 2003)).  It is true, as the defendants argue, that a party is not required to

"preserve every shred of paper, every e-mail or electronic document, and every backup tape,"

however, in some circumstances, "[t]he general duty to preserve *may* also include deleted data,

data in slack spaces, backup tapes, legacy systems and metadata." *Victor Stanley,* 269 F.R.D. at

524 (emphasis in original) (citations and quotations omitted).  The court in *Zubulake,* reasoned

that although a party does have a duty to retain all relevant documents, such party was not

obligated to "preserve all backup tapes even when it reasonably anticipates litigation" or to retain

"multiple identical copies" but instead may decide how to select among multiple backup copies.

220 F.R.D. at 217.  The court did acknowledge that a party must not destroy

> unique, relevant evidence that might be useful to an adversary.  While a
> litigant is under no duty to keep or retain every document in its possession

> . . . it is under a duty to preserve what it knows, or reasonably should
> know, is relevant in the action, is reasonably calculated to lead to the
> discovery of admissible evidence, is reasonably likely to be requested
> during discovery and/or is the subject of a pending discovery request.

*Id.* (internal quotation and citation omitted).

In this case, there can be little doubt that Mr. Abell, Ms. Bertola, and American Trust were under a duty to preserve beginning no later than July 2, 2012, if not earlier. Mr. Abell was engaged in litigation with Ms. Wilson and others long before that date. Once Ms. Wilson obtained her judgment, the Superior Court of the District of Columbia issued an order in 2008 preventing her from enforcing the judgment against Mr. Abell. The Superior Court removed that prohibition in November 2011. It cannot be doubted that, once the Superior Court removed the prohibition on Ms. Wilson to pursue discovery, Ms. Wilson would seek wholesale discovery on all aspects of the family business in aid of execution, including the assets of and information about Mr. Abell, Ms. Bertola, and American Trust.

Moreover, by that time, Mr. Abell was the subject of judgments for his fraudulent actions. Mr. Abell and Ms. Bertola had been actively involved in ongoing discovery disputes in a number of cases and were well-versed in discovery procedures and obligations. While licensed to practice law, Ms. Bertola represented family business entities in a number of lawsuits. Both she and Mr. Abell were aware of the numerous lawsuits against Mr. Abell and knew that Ms. Wilson and others would seek discovery of their assets. As an attorney who was actively involved in discovery matters, Ms. Bertola was aware that she was under a duty to preserve documents related to the family business, of which the computers were part.

More specifically, Ms. Wilson issued a subpoena to Ms. Bertola on July 2, 2012. As stated in the Findings of Fact, the subpoena sought wide ranging documents from Ms. Bertola for all Abell-related entities, including American Trust and many named entities, as well as "[a]ny

34

other company or entity owned in whole or part by Abell." Tr. Ex. 98g. The subpoena sought the discovery of ESI. The subpoena was issued pursuant to an order entered on June 25, 2012, that also permitted a subpoena *duces tecum* to be served on American Trust.

Further, at her deposition on July 23, 2012, Ms. Bertola admitted she "understood there is an obligation to preserve all electronically stored information." ECF 244 at 154:15-22. At trial, she admitted that when she was deposed in July 2012, she "understood [she] had an obligation not to destroy evidence." ECF 245 at 65:13-19. It was also stipulated at trial that Ms. Bertola received a litigation hold letter on or about July 26, 2012, from Ms. Wilson.

Finally, as set forth in the Findings of Fact, Ms. Bertola, personally and on behalf of American Trust and other Abell-related entities, and Mr. Abell were regularly, if not repeatedly, advised of their obligations to preserve evidence from July 2012 through 2014. Those communications included very detailed descriptions of the duty to preserve, including its application to ESI. *See e.g.*, Tr. Ex. 2.

The record established, beyond any reasonable basis for dispute, that Mr. Abell and Ms. Bertola, personally and as the person responsible for maintaining documents and ESI for the family business including American Trust, were aware of their obligations to preserve evidence no later than July 2, 2012, and were often reminded of that duty in great detail and warned of the consequences of violating that duty.

## 2. Culpability

The courts in this Circuit have held that sanctions are warranted when the party destroying evidence did so with a "culpable state of mind exhibited by bad faith/knowing destruction [,] gross negligence, [or] ordinary negligence." *Thompson v. U.S. Dept. of Housing and Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003).

> Moreover, spoliation does not result merely from the 'negligent loss or
> destruction of evidence.' *Vodusek,* 71 F.3d at 156. Rather, the alleged
> destroyer must have known that the evidence was relevant to some issue in
> the anticipated case, and thereafter willfully engaged in conduct resulting
> in the evidence's loss or destruction. *See id.* Although the conduct must be
> intentional, the party seeking sanctions need not prove bad faith. *Id.*

*Turner*, 736 F.3d at 282.  Willfulness is equivalent to "intentional, purposeful, or deliberate

conduct."  *Victor Stanley,* 269 F.R.D. at 530 (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th

Cir. 2008)).  A finding of "bad faith" requires "destruction for the purpose of depriving the

adversary of the evidence."  *Id*. at 530.  Moreover, "the volume and timing of Defendants'

spoliation is telling."  *See id.* at 531.

Ms. Bertola's destruction of ESI was intentional and in bad faith, and done for the

express purpose of depriving the Trustee, Ms. Wilson, and other claimants of evidence.  Ms.

Bertola ran the Wipe Free Space feature before the two computer imagings, and at other times, to

destroy data.  She did so to ensure that the deleted information would be lost forever.  She did so

as part of an intentional effort to prevent the ESI from being retrieved in discovery.  This is

established by both direct evidence and substantial circumstantial evidence.  It is also established

by the lack of credibility in Ms. Bertola's explanation.

The direct evidence was uncontroverted.  In 2012, Mr. Abell, Ms. Bertola, and Mr. Falla

had a specific discussion about the imaging order Ms. Wilson had obtained from the Superior

Court of the District of Columbia for the businesses' computers.  Ms. Bertola told Mr. Falla prior

to the imaging that she had used a program to clean up all of the computers for the information

she did not want Ms. Wilson's attorney to have.

Mr. Abell was present when Ms. Bertola said this to Mr. Falla.  He did nothing to stop

her.  To the contrary, he relied on Ms. Bertola to maintain and produce the ESI and allowed her

to clean the computers for the information she did not want Ms. Wilson to obtain.

Mr. Falla's testimony was credible.  He had no axe to grind with the defendants, and he was obviously uncomfortable with the entire exchange.  The defendants called Mr. Abell to the stand, but did not ask him any questions about Ms. Bertola's statements.  Mr. Abell did not deny he was present when Ms. Bertola made the statement and did not deny she made them.  The defendants called Ms. Bertola to the stand.  She did not deny she made the statements to Mr. Falla.

The significance of Mr. Falla's testimony was established by the defendants themselves.  At trial, the defendants objected to the Trustee's offer to introduce the *de bene esse* deposition testimony of Mr. Falla, arguing he should be required to appear.  Defendants argued that "much of this case is based on credibility" and "when credibility is a pivotal issue . . . live presence is necessary, it's required, it's preferable."  ECF 242 at 11:10-13.  The court sustained the objection and required live testimony from Mr. Falla.  The court agrees that, indeed, "much of this case is based on credibility."  Mr. Falla's testimony stands uncontroverted and he was credible; Ms. Bertola was not.

Further, Ms. Bertola's specific intent to destroy ESI was also established by circumstantial evidence.  For example, Bertola did not tell Mr. Morales she was running the Wipe Free Space feature.  Mr. Morales was quite specific in his recollection that they never discussed CCleaner, and he was not aware anyone other than he was using the CCleaner on the computers.  Ms. Bertola also did not tell Brian Small, another computer consultant for the businesses, that she was using CCleaner or the Wipe Free Space feature.  It is simply not credible for her to say her purpose for running a program that permanently destroyed data was to keep the computers in good working order, when she did not ask the two people who could assess the utility of her actions and tell her whether or not it served that purpose.

In addition, after the Superior Court of the District of Columbia issued the order on September 20, 2012, Ms. Bertola used the Wipe Free Space feature on September 21, 23, 24, and 25, 2012.  In 2014, the record established that Ms. Bertola stalled the Trustee in his efforts to obtain an imaging.  During that time, she used the Wipe Free Space feature many times immediately prior to the imaging.  The court finds it inconceivable that she would use the Wipe Free Space feature on the eve of two imagings, in the face of seemingly endless allegations (and findings) of discovery tampering and abuse, simply for the unproven benefit of improving the operations of the computers.

The timing of her use of the Wipe Free Space feature just before imagings also supports the conclusion that Ms. Bertola's claim that she was simply using it for general computer maintenance is not credible.  *See Victor Stanley*, 269 F.R.D. at 504 ("the fact that Pappas undertook to delete ….only days before a scheduled imaging of his work computer's contents compels the conclusion that he was knowingly engaged in efforts to destroy evidence that he regarded harmful to Defendants and beneficial to the Plaintiff."); *Technical Sales Associates, Inc. v. Ohio Star Forge Co.*, 2009 WL 728520, at *8 (E.D. Mich. Mar. 19, 2009) (wiping program used right after request for forensic examination so "the timing of the destruction appears more than coincidental."); *United States v. Krause (In re Krause)*, 367 B.R. 740, 768 (Bankr. D. Kan. June 4, 2007) (defendant purged the ESI just prior to turning over computer per court order); *Columbia Pictures, Inc. v. Bunnell ("Columbia Pictures II")*, 2007 WL 4877701, at *6 (D.C. Cal. Dec. 13, 2007) ("timing of the change" belies innocent explanation proffered by defendant); *Smith v. Slifer Smith & Frampton/Vail Assocs. Real Estate, LLC*, 2009 WL 482603, *12 (D. Colo. Feb. 25, 2009) ("timing of the destruction indicates that whoever was responsible knew that the evidence discovered would very well reveal information defendants did not want

revealed."); *Johnson v. Wells Fargo Home Mortg., Inc.*, 2008 WL 2142219, *4 (D. Nev. May 16, 2008) (finding plaintiff's conduct willful where hard drive reformatted within five days after receipt of notice of intent to seek discovery of contents of hard drive); *Rosenthal Collins Group, LLC v. Trading Techs. Int'l*, 2011 WL 722467, *10 (N.D. Ill. Feb. 23, 2011) ("This Court finds it impossible to believe that it is merely coincidence that the seventh disk happened to be wiped …the same day that [the forensic consultant] was scheduled to inspect it."); *Multifeeder Tech., Inc. v. British Confectionary Co., Ltd.*, 2012 U.S. Dist. Lexis 133197, *54-55 (D. Minn. Apr. 26, 2012) (bad faith when wiping program executed "just days before [computer] was scheduled to be imaged."); *Kucala Enters. v. Auto Wax Co.*, 2003 U.S. Dist. Lexis 19103, *22-23 (N.D. Ill. Oct. 27, 2003) (the court was not convinced that plaintiff did not act willfully and with the purpose of destroying discovery by purchasing "Evidence Eliminator" wiping program and using it just hours before scheduled imaging); *Philips Elec. N. Am. Corp. v. DC Tech.*, 773 F. Supp. 2d 1149, 1207 (D. Utah 2011) (in finding bad faith the court considered that wiping program used in the days before the court-ordered imaging).

American Trust argues that Ms. Bertola was not acting on its behalf.  The court disagrees. In the Findings of Fact, the court found that Ms. Bertola maintained the paper and electronic records, including maintaining and producing ESI, for American Trust and all Abell-related entities.  She ran Wipe Free Space to protect the entire family business, including American Trust, which is purportedly owned by her children.

"A party to a lawsuit, and its agents, have an affirmative responsibility to preserve relevant evidence.  A [party] . . . is not relieved of this responsibility merely because the [party] did not itself act in bad faith and a third party to whom [the party] entrusted the evidence as the one who discarded or lost it."  *Goodman*, 632 F. Supp. 2d at 522 n.16.  The law of agency is

"directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master."  *Id.*  It is the party's responsibility to ensure that its agents do not spoliate evidence, and a party cannot defeat a spoliation claim by arguing that the agent's spoliation was not done in furtherance of the party's business.  *Philips Elec.*, 773 F. Supp. 2d at 1207.

American Trust stated in its response to the spoliation motion that "[f]or purposes of the spoliation issue, American Trust does not contest the Trustee's assertion that Bertola acted as its agent."  ECF 126 at 4.  American Trust attempted to alter this admission in its post-trial brief, ECF 264 at 13-14, but offered no explanation or reason why it should be relieved of the admission.  In any event, the record left no doubt that Ms. Bertola was the responsible person for maintaining and producing American Trust's ESI at all relevant times to this proceeding.  No witness from American Trust or on behalf of any other defendant, including Ms. Bertola and Mr. Abell, testified to the contrary.  Mr. Abell, who served as the general manager of American Trust until his incarceration prevented him from continuing to do so, relied on Ms. Bertola for the functions of maintaining and producing ESI of American Trust.  While he was its general manager, he knew she was using a program to clean the computers of the information she did not want Ms. Wilson's attorney to have; he was present when Ms. Bertola told that to Mr. Falla.  He did not take any steps to prevent her from taking those actions.

Ms. Bertola held herself out to the Superior Court of the District of Columbia as the person responsible for American Trust's record keeping and document production.  In the September 20, 2012 Imaging Order, the court stated "[o]n or before September 25, 2012, Defendant and Vincent Abell shall allow the ESI forensic consultant … to image all the hard drives (whether internal or external) of all computers used by any of these parties.  These shall include all computers identified by Marta Bertola during her…deposition."  Tr. Ex. 59 at 2.

Further, Ms. Bertola accepted the July 3, 2013 preservation letter sent by Ms. Wilson to American Trust, which was addressed to Ms. Bertola.  Tr. Ex. 2.  She filed a proof of claim on behalf of American Trust on July 2, 2013, listing herself as its authorized agent under penalty of perjury.  Claim 55-1 (Bankr. Case No. 13-13847).  There was no evidence that the children had any role in American Trust's operations, business, or record maintenance and production.  And it may be that at least one of the children is not even aware he holds an interest in American Trust.  Ms. Bertola testified at the supplemental hearing that she was quite sure he did not include his purported interest in American Trust as an asset in his college financial aid application.[13]  The evidence that Ms. Bertola was acting on behalf of American Trust is overwhelming.

### 3.  Relevance of Lost Evidence

Lastly, the court must consider the relevance of the lost evidence and the prejudice that resulted from spoliation.  For the purpose of spoliation "relevance" is a two-pronged finding of (1) relevance and (2) prejudice.  *First Mariner Bank v. Resolution Law Group, P.C.*, 2014 WL 1652550, at *12 (D. Md. Apr. 22, 2014) (citing *Victor Stanley*, 269 F.R.D. at 531-32)).  In this context evidence is considered relevant if "a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."  *Goodman*, 632 F. Supp. 2d at 509.

A finding that the failure to preserve evidence was due to either gross or ordinary negligence, requires the plaintiff to establish that the lost documents were relevant to the case.  *See Thompson,* 219 F.R.D. at 101 (quoting *Zubulake IV,* 220 F.R.D. at 220).  However, when the party alleging spoliation shows that the other party acted willfully in failing to preserve evidence,

---

[13] The court finds American Trust's argument perplexing to the extent it applies to the period after November 2013.  In support of its motion to dismiss the complaint, American Trust submitted its own exhibit that stated the Ms. Bertola was its General Manager since November 18, 2013.  ECF 25-2, at 2.  Thus, at least since that date, American Trust's own document establishes her agency.

the relevance of that evidence is presumed in the Fourth Circuit.  "The reason relevance is presumed following a showing of intentional or willful conduct is because of the logical inference that, when a party acts in bad faith, he demonstrates fear that the evidence will expose relevant, unfavorable facts."  *Sampson v. City of Cambridge, Md.,* 251 F.R.D. 172, 179 (D. Md. 2008) (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995)).  The presumption is rebuttable.  To rebut the presumption of relevance, "the alleged spoliator must present *clear and convincing* evidence demonstrating that the spoliated material or documents were of minimal or little import."  *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 499 (E.D. Va. 2011) (emphasis in original) (citing *Samsung Elec. Co. v. Rambus, Inc*, 439 F. Supp. 2d 524, 543 (E.D. Va. 2006), *vacated on other grounds,* 523 F.3d 1374 (Fed. Cir. 2008)).

Here, the court has concluded that Ms. Bertola, with Mr. Abell's knowledge and acquiescence, acted in bad faith and intentionally destroyed data.  Therefore, the relevance of the evidence is presumed.  The defendants did not rebut the presumption.  Indeed, both the Trustee's and the defendant's experts admitted there is no way of determining what was deleted by the use of the Wipe Free Space feature.  What is clear, however, is that Ms. Bertola ran the Wipe Free Space feature on numerous occasions just before the 2012 and the 2014 imagings.  It is also clear that, at least with respect to the 2014 imagings, Ms. Bertola stalled the Trustee's efforts to obtain an imaging and repeatedly ran Wipe Free Space during that time.  While these facts are relevant to Ms. Bertola's culpability, they likewise establish that she believed the materials to be relevant to the Trustee's claims.  The "reason relevance is presumed following a showing of intentional or willful conduct is because of the logical inference that, when a party acts in bad faith, he

demonstrates fear that the evidence will expose relevant, unfavorable facts." *Sampson*, 251

F.R.D. at 179.

The Trustee has been substantially prejudiced by the spoliation.  As a result of Ms.

Bertola's efforts:

- Countless documents/files were destroyed on multiple computers on multiple occasions in September 2012 by her use of the Wipe Free Space utility of CCleaner just prior to the 2012 Court-ordered imaging of the Phoenix electronic data stores.

- In addition, in expectation that that the computers would be imaged, Ms. Bertola also deleted thousands of user created files on various computers just prior to the 2012 Court-ordered imaging of those computers (as shown by the Deleted File Listings submitted by the Trustee).

- Countless documents/files were destroyed on multiple computers on multiple occasions in 2014 by Ms. Bertola's use of the Wipe Free Space feature just prior to the turnover of the computers for imaging in this matter.

- In addition, in expectation that that the computers would be imaged Ms. Bertola also deleted thousands of user created folder files on various Phoenix computers just prior to the turnover of those computers in this matter (as shown by the Deleted File Listings submitted by the Trustee).[14]

The Trustee claims in the amended complaint that Mr. Abell, Ms. Bertola and other

defendants engaged in an ongoing concerted effort to conceal assets, create sham loans and other

transactions, transfer assets, and all the while Mr. Abell retained control over them.  Specifically,

the Trustee asserts that the prejudice that results from the defendants' spoliation has impacted his

underlying claims of:

> concealment and conspiracy to conceal against Mr. Abell and his co-defendants necessarily rely on ESI – evidence of the financial arrangements of the complex network established by Mr. Abell and Ms. Bertola, the electronic books and records maintained by Ms. Bertola at

---

[14] The Deleted File Listing for computer 001, Tr. Ex. 300, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 002, Tr. Ex. 301, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 004, Tr. Ex. 302, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 006, Tr. Ex. 303, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 008, Tr. Ex. 304, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 011, Tr. Ex. 305, shows over 100,000 deleted file entries.
The Deleted File Listing for computer 013, Tr. Ex. 306, shows over 100,000 deleted file entries.

> Modern Management; electronic communications . . .; and metadata concerning the time of creation of particular transactional documents.

ECF 273 at 5-6.  The least that can be said is that Ms. Bertola has dictated the scope of the ESI evidence that will be available to the Trustee.  He will be left with whatever Ms. Bertola has chosen not to delete.  *See Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009) (finding dismissal to be the only appropriate remedy because the plaintiff negligently spoliated evidence that irretrievably prejudiced a parties ability to defend itself).  And, as stated above, the experts for both sides agree that it cannot be determined what that was.  ECF 245 at 124-125 and 127-128; ECF 242 at 76.

Moreover, given the nature of the Trustee's claims, metadata that shows when documents were created or amended, communications among defendants, and electronic evidence of transaction, would be the very type of evidence the Trustee would scrutinize to support the claims.  The destruction of this information is undoubtedly prejudicial to the Trustee.

In addition, the Other Spoliation Efforts by Ms. Bertola, even if the defendants could establish that deleted or lost information could be recovered, were completely inconsistent with the duty to preserve.  The Other Spoliation Efforts evidence her disdain for the discovery process and for honoring her discovery obligations.

Finally, it cannot be ignored that Ms. Bertola's and Mr. Abell's actions have caused undue delay and increased expenses of this litigation, to the Trustee's prejudice.  *See First Mariner Bank*, 2014 WL 1652550, at *18.

## 4.  Sanctions

Having concluded that defendants' actions meet the three prong test for finding spoliation in the Fourth Circuit, and that the spoliation was intentional and in bad faith, the court now turns to the appropriate sanction.  The spectrum of sanctions a court may impose is extensive, and

includes fines, the entry of default judgment, or dismissal. "[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590. Put another way, an appropriate sanction for the spoliation of evidence should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Victor Stanley*, 269 F.R.D. at 534 (internal quotation and citation omitted).

It is well recognized in the Fourth Circuit that "[a court] must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461-64 (4th Cir. 1993); *Projects Management Co. v. Dyncorp Intern. LLC*, 734 F.3d 366 (4th Cir. 2013). The court may order dismissal or judgment by default "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Projects Management*, 734 F.3d at 373-74. Before the court can exercise its inherent power to dismiss a case based on the wrongdoing of a party, it must first consider six well established factors. *Id.* at 373.

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 373-74 (quoting *Shaffer Equip. Co.*, 11 F.3d at 462-63); *see also Suntrust Mortg., Inc. v. United Guar. Residential Co. of North Carolina*, 508 Fed. App'x. 243, 254 (4th Cir. 2013). In addition, in order to justify dismissal, the court must "conclude either (1) that the spoliator's

conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." *Suntrust Mortg.*, 508 Fed. App'x. at 255 (quoting *Silvestri*, 271 F.3d at 593).

Finally, in determining what sanction is appropriate, the court may consider the party's prior discovery conduct. In *Mut. Fed. Sav. & Loan v. Richards & Assocs., Inc.*, 872 F.2d 88, 94 (4th Cir. 1989), a case seeking relief under Rule 37(b), the Fourth Circuit held that severe sanctions are warranted for repeat violators. In *Diamond v. Bon Secours Hosp.*, 2010 U.S. Dist. LEXIS 67009 *31 (D. Md. July 6, 2010), the court dismissed the complaint as a sanction for failure to obey discovery order stating "[p]laintiff has a substantial history of engaging in stall tactics and refusing to comply with Court orders."[15]

The court now turns to the *Projects Management* standards:

1.   Degree of the wrongdoer's culpability

Ms. Bertola's conduct, on behalf of herself, American Trust and Mr. Abell, has been so egregious as to amount to a forfeiture of their claims, as contemplated by *Silvestri*, 271 F.3d at 593. She acted with the express intention of destroying ESI and keeping it from Ms. Wilson. She admitted it to Mr. Falla, in so many words. Mr. Abell knew she was doing this and he allowed it to continue. Ms. Bertola continued the same activity after the bankruptcy case was

---

[15] Courts also consider the party's misconduct in other cases in determining a proper sanction. "Defendants' past violations weigh heavily in favor of imposing a default judgment." *Southern New England Telephone Co. v. Global Naps, Inc.*, 251 F.R.D. 82, 95 (D. Conn. 2008). As the *Southern New England Telephone* court put it in ordering a default judgment for spoliation, when parties have a history of "roll[ing] the dice of the district court's tolerance for deliberate obstruction… they should not be allowed to return to the table." *Id.* at 96 (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995)). *See also Atkins v. Fischer*, 232 F.R.D. 116, 129-31 (D.C. Cir. 2005) (relying upon party's sanctions in other cases in support of dismissal of claims); *Travelers Ins. Co. v. St. Jude Hosp.*, 38 F.3d 1414, 1417-18 (5th Cir. 1994) (affirming award of sanctions when district court considered conduct in collateral bankruptcy proceedings in its sanctions order); *Hissom v. New York City Dep't of Housing*, 1987 WL 45807, at *7 (S.D.N.Y. Dec. 22, 1987) ("in order to further the purpose of deterrence, the court should take into account whether the persons subject to sanctions have abused the judicial system in the past"); *Multifeeder Tech., Inc. v. British Confectionary Co., Ltd.*, Civ. No. 09-1090 (JRT/TNL), 2012 U.S. Dist. LEXIS 133197, *55-56 (D. Minn. Apr. 26, 2012) (finding that the spoliators' "prior deficient search for evidence" added support to the inference that their subsequent evidence destruction was intended "to suppress relevant evidence.").

filed.  While the circumstantial evidence also leads the court to conclude that she destroyed evidence intentionally, in bad faith, and with Mr. Abell's acquiescence, her uncontroverted admission leaves no doubt.

Ms. Bertola destroyed ESI after she and Mr. Abell had been explicitly told on numerous occasions they had a duty to preserve it, reminded to take care to preserve it, and warned of the consequences that would result from violating the duty.  *See e.g.* Tr. Ex. 2.  Despite these notices and warnings, she destroyed evidence for the stated purpose of keeping Ms. Wilson, and later, the Trustee, from obtaining it.  Their degree of culpability could not be higher.

2.  Client's blameworthiness compared to its attorney

The discovery abuses and destruction of data are the actions of Mr. Abell and Ms. Bertola, personally and on behalf of Mr. Abell and the Abell-related entities.  No attorney played a role in the destruction, insofar as the record before the court establishes.  The degree of blameworthiness is entirely upon the defendants.

3.  Prejudice to the judicial process and administration of justice

Mr. Abell and Ms. Bertola have made a mockery of the judicial process.  The court begins with their ongoing and repeated discovery abuses.  The Trustee states that Mr. Abell and Ms. Bertola are the subject of at least nineteen court orders requiring the defendants to produce discovery or subjecting them to sanctions.  There is no doubt Mr. Abell and Ms. Bertola have engaged in widespread and continuous discovery abuse.

Taking Mr. Abell's and Ms. Bertola's past discovery conduct into account is especially appropriate here, given the relationship between this adversary proceeding and the earlier cases.  To some extent, this adversary proceeding is a continuation of the state court litigation in which those orders arose.  Many of the plaintiffs in those cases are creditors of the estate, and are

among the parties on whose behalf the Trustee seeks to recover assets and funds.  They are the same parties who have been stonewalled by the defendants' actions in other cases.  Ms. Wilson has been seeking documents and information from defendants at least since 2012, and has been hampered by defendants' conduct.  Her lawsuit against Mr. Abell dates back to 2004.

In the Findings of Fact, the court listed numerous court orders that found Mr. Abell to be engaged in discovery abuses.  Whether or not there are nineteen such orders as the Trustee states is beside the point: Little more needs to be said about Mr. Abell's disdain for the judicial process than, at the time of the hearing on the spoliation motions, he was incarcerated for his refusal to comply with discovery orders.  Quite obviously incarceration did not provide sufficient motivation to him; he refused to provide discovery to the Trustee in a separate contested matter in this very bankruptcy case, blaming Ms. Bertola for the failure.  ECF 501 at 2 (Bankr. Case No. 13-13847).

While Ms. Bertola has not been incarcerated for her discovery abuses, the discovery orders and court rulings described in the Findings of Fact addressing her actions are no less remarkable.  *See supra* ¶6.

Moreover, the circumstances of Ms. Bertola's suspension from the practice of law in 2013 reinforce the conclusion that she holds little regard for the judicial process.  In September 2010, she was decertified from practicing law in Maryland.  Tr. Ex. 55 at ¶4.  She received the decertification order and "understood the Order to mean she could not practice law in Maryland."  *Id*. at ¶7.  Nevertheless, she subsequently appeared at a hearing in Charles County Circuit Court on behalf of Mr. Abell and made several representations to the court that she was authorized to practice law.  *Id*. at ¶5.  She later filed a motion on behalf of Mr. Abell,

representing that she was his counsel. *Id.* at ¶6. As a result, she was permanently suspended from the practice of law. It is her knowing misrepresentation to the court that gives pause here.

    4. <u>Prejudice to the victims</u>

The prejudice to the victims is great. Ms. Wilson sued Mr. Abell in 2004 and obtained a judgment in 2007. Nine years later, she continues to be stymied by Mr. Abell and Ms. Bertola. The Trustee has been required to spend time and considerable expense uncovering the destruction of evidence. The Trustee and Ms. Wilson are left with the ESI record Ms. Bertola and Mr. Abell have allowed them to have. They do not know, nor can the court determine, exactly what was deleted by Ms. Bertola. The Trustee's ability to present his claims has been compromised at least by the loss of metadata that could be used to determine when and who were engaged in the actions alleged in the amended complaint.

    5. <u>The availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed person, and deterring similar conduct in the future</u>

Entry of a judgment is the only useful sanction in this case. It serves the necessary purpose of punishing Mr. Abell and Ms. Bertola for their transgressions and will serve as a deterrent to others.

Monetary sanctions against Mr. Abell will serve no purpose. He owes millions of dollars of unpaid final judgments. Further, sanctions of fees and costs will merely place the Trustee in the economic position he was in the day he discovered the spoliation, with no remedy for the spoliation itself.

The defendants argue that no sanctions are warranted because the Preservation Order protects the estate from further destruction of ESI. ECF 114. The Preservation Order, however, only prohibits destruction of ESI going forward. It does not and simply cannot provide the Trustee with any mechanism to remedy the previous cleansings that have occurred since at least

2012.  Nor does any other available remedy, including an adverse inference, a preclusion order, or a presumption in favor of the Trustee, mitigate the damage caused by the defendants in the days and weeks leading up to the imagings.  Lesser remedies will not make available the information that was destroyed by the defendants.

6.   The public interest

There is a strong public interest in favor of entering judgment against Mr. Abell, Ms. Bertola, and American Trust.  That interest was stated clearly and succinctly by the Fourth Circuit in *Silvestri*:

> The policy underlying this inherent power of the courts [to sanction for spoliation] is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. '[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition.' *Shaffer Equipment*, 11 F.3d at 457. The courts must protect the integrity of the judicial process because, '[a]s soon as the process falters ... the people are then justified in abandoning support for the system.' *Id.*

271 F.3d at 590.  This policy consideration is directly implicated here.

The court concludes that Mr. Abell and Ms. Bertola have "abuse[d] the process at a level that is utterly inconsistent with the orderly administration of justice [and] undermines the integrity of the process."  *Projects Management*, 734 F.3d at 373-74.  Their conduct was "so egregious as to amount to a forfeiture of [their] claims."  *Silvestri*, 271 F.3d at 593.  Entry of judgment is a necessary and appropriate remedy here.

Finally, the Trustee requests an award of attorneys' fees and costs.  In *Goodman*, the court described four situations in which a court will award attorneys' fees and costs when ruling on a spoliation motion.  632 F. Supp. 2d at 523-24.  One situation is applicable here: "in addition

to a spoliation sanction, a court will award a prevailing litigant the reasonable costs associated with the motion *plus* any investigatory costs into the spoliator's conduct." *Id*. at 524 (emphasis in original). This situation was present in *Victor Stanley*, where the court awarded "costs related to uncovering defendants' discovery abuses; preparing, filing, and arguing all of plaintiff's ESI motions; and retaining [experts]." 269 F.R.D. at 539 (imposing award of attorneys' fees and costs in addition to default judgment).

An award of attorneys' fees plus investigatory costs is appropriate. The Trustee was required to expend a considerable amount of estate resources to uncover the spoliation, including the costs of his expert consultant who was necessary to discover the deleted information, and to bring and prosecute the spoliation motion. The creditors of the estate should not be forced to bear the expense of defendants' actions. The court will order Mr. Abell, Ms. Bertola, and American Trust to pay the Trustee his attorneys' fees and other costs associated with the spoliation motions against them. Within forty-five days of the date of the court's Order, the Trustee must submit to the court an itemization (with sufficient documentary backup and any accompanying affidavits) in support of the fees and cost award sought by the Trustee.

## Conclusion

For the foregoing reasons the court will grant the spoliation motion against Mr. Abell, Ms. Bertola, and American Trust. A separate order will issue.

cc:     all parties
        all counsel

## End of Memorandum of Decision